## A01A2357. EICHELBERGER v. THE STATE.
(557 SE2d 439)

ELDRIDGE, Judge.

Following a bench trial in the Superior Court of Cobb County wherein the parties stipulated to the State's case as made out in the hearing on the motion to suppress, Avery Eichelberger was found guilty of trafficking in cocaine (more than 28 grams) and misdemeanor possession of marijuana. He appeals and contends the trial court erred in denying his motion to suppress based upon an improper stop of his vehicle. Because we find no error, we affirm.

When reviewing a trial court's decision on a motion to suppress, this court's responsibility is to ensure that there was a substantial basis for the decision. The evidence is construed most favorably to uphold the findings and judgment, and the trial court's findings on disputed facts and credibility are adopted unless they are clearly erroneous. Further, since the trial court sits as the trier of fact, its findings are analogous to a jury verdict and will not be disturbed if there is any evidence to support them.[1]

With these principles in mind, the evidence of record shows that on April 17, 1999, several members of the Cobb County Police Department were doing tactical surveillance in the areas of Powers Ferry Road, Akers Mill Road, and Cumberland Mall on the lookout for a person or persons fitting the description of an offender identified at the time as the "Northside Rapist" who had been preying on young women in apartment complexes in the vicinity. At approximately 1:30 a.m., Officer Don May and his partner Don Massey spotted a dark red Ford sport utility vehicle ("Ford") sitting in the parking lot of one of the apartment complexes under stakeout. The tint on the windows of the Ford made it difficult to ascertain who was in the vehicle, but a male, later identified as Kenneth Ferrell, was in the driver's seat apparently "loitering" in the lot. The officers, in an unmarked vehicle, took up a position close by and observed the male counting a large sum of money. After five or ten minutes, another male, later identified as appellant Eichelberger, came out of an apartment and got into the Ford; he, too, appeared to be counting a large amount of money.

As the Ford pulled away, the officers noted that the vehicle had a dealer's drive-out tag. Based upon their experience, drive-out tags are often used to hide stolen vehicles; to hide vehicles that the owner has failed to register in order to avoid paying ad valorem tax; and to

---

[1] *Gilbert v. State*, 245 Ga. App. 809, 810 (539 SE2d 506) (2000).

mask the identity of a vehicle during criminal activity. The undercover officers radioed for Officer Michael Yancey, who, because he was driving a marked patrol unit, acted upon the undercover officers' requests to stop specified vehicles. In addition, the officers called for another undercover vehicle to aid in the stop. The surveillance vehicles followed the Ford at a distance at which they could not be seen until Yancey arrived. Yancey was driving a blue GMC Yukon with a siren, a light bar on the roof, two four by six blue lights in the grill, flashing headlights and taillights, and gold letters on the sides, hood, fenders, and back door stating "Police"; in addition, the Yukon, as a canine unit, also stated "Police Dog" in red letters on the side windows.

Yancey eventually overtook and passed the surveillance units on Atlanta Road, a four-lane highway. He located the Ford a short distance away on Atlanta Road and pulled in behind it. Both vehicles were traveling at approximately 35 to 45 mph in the left lane of the two southbound lanes. Yancey activated all the emergency lights on his vehicle, as well as his siren, in an attempt to execute a stop. At the same time, the two unmarked surveillance units which had been behind the Ford pulled alongside it in the right lane: one unit passed the Ford on the right, pulling into the left lane three hundred yards ahead and then gradually slowing down in order to force the same upon the Ford; the other unit remained in the right lane beside the Ford.

At first it appeared that "[t]he vehicle began stopping as if he was going to go ahead and comply with the direction by blue lights and siren." Officer Yancey testified at the motion to suppress that the following then occurred:

> Almost immediately the suspect vehicle [Ford] braked abruptly, and so I got on the brakes to keep from hitting them. As soon as I got on the brakes, they accelerated rapidly away. We had the surveillance car in front, and they tried to go between me and the surveillance car. I came up on the left side, and blocked them in on the left side. They darted around to try to go around on the right side, and the surveillance car came up on the right side and blocked them in on the right side. They came back to the left and tried to go between the surveillance car and my vehicle a second time. We were going real slow by this time, and got them stopped. At that point there was no room for them to go between me and the surveillance vehicle.

Yancey testified that the Ford accelerated rapidly a couple of hundred feet before reaching the surveillance unit in front of him and

attempting to go around. It was only because Officer Yancey acceler-ated in kind and pulled to the Ford's left that such action was pre-vented: "And it was my positioning of the vehicle that forced him to stay behind the unmarked car." After the Ford attempted to bolt to the right and was cut off by another unit, it "had to stop. He had no place to go." Thereafter, an investigation ensued which included a free air search by the canine present on the scene in Yancey's marked K-9 unit. The cocaine for which appellant Eichelberger was charged was found on his person.

At the hearing on the motion to suppress, all of the officers who testified stated that the Ford was attempting to flee from the stop. During the bench trial, the driver of the Ford, Ferrell, testified that he had not attempted to flee but that the officers "swooped" down on him in unmarked vehicles; that he briefly swerved to the left in order to avoid hitting one of the unmarked cars which braked abruptly in front of him; and that he did not see any blue lights until after the stop was completed. The trial court specifically found that the Ford had attempted to flee. *Held*:

1. Eichelberger contends that Ferrell's version of events was "uncontroverted," and thus there was no basis upon which the trial court could find the Ford was attempting to flee. However, "[i]t is the trial court's duty to resolve conflicts in the evidence, and its findings of credibility and fact will not be disturbed on appeal unless they are clearly erroneous."[2] Here, the officers involved testified that after Yancey initiated his blue lights and siren, the Ford driven by Ferrell attempted to flee therefrom. Their testimony provided an objective basis about the movements of the Ford from which such conclusion could legitimately be drawn. The trial court resolved the conflict between the officers' testimony and Ferrell's testimony by making a credibility determination as to who was telling the truth and specifi-cally found that the Ford was attempting to flee from the police. As there is evidence to support such finding, it is not clearly erroneous and will be upheld.

2. Based upon our holding in *Berry v. State*,[3] Eichelberger con-tends that since it is impermissible to stop a vehicle in order to inves-tigate the validity of a drive-out tag,[4] the stop in the instant case was impermissible. However, regardless of the propriety of an officer's basis for the execution of a *Terry*[5] traffic investigative stop, attempt-

[2] *Wilburn v. State*, 230 Ga. App. 619 (1) (497 SE2d 380) (1998).

[3] 248 Ga. App. 874 (547 SE2d 664) (2001).

[4] A fact about which the officers were unaware since the stop in the instant case occurred long before this Court overruled existing law and held such stop to be improper. *Berry v. State*, supra at 890-896 (Eldridge, J., dissenting).

[5] *Terry v. Ohio*, 392 U. S. 1, 21 (88 SC 1868, 20 LE2d 889) (1968).

ing to flee from such stop is a separate crime altogether, i.e., fleeing or attempting to elude a police officer.[6] Such offense does not require that an investigative traffic stop be proper, and this Court will not find that the determination of whether there is a "legal" basis for a traffic stop belongs to the driver, thereby giving him the right to ignore blue lights and a siren if he determines he is being stopped illegally. "Assuming, arguendo, that the stop lacked articulable suspicion, [the] remedy was a motion to suppress the fruit of the illegal stop. . . . A *Terry* violation does not provide carte blanche to violate OCGA § 40-6-395 (a)."[7] Accordingly, stopping the Ford for attempting to elude was appropriate, regardless of the officers' basis for the initial approach.

*Judgment affirmed. Andrews, P. J., and Miller, J., concur.*

DECIDED DECEMBER 6, 2001 —

J. *Alfred Johnson*, for appellant.

*Patrick H. Head*, District Attorney, *Richard H. Kimberly, Jr., Amelia G. Pray*, Assistant District Attorneys, for appellee.

---

[6] OCGA § 40-6-395 (a).

[7] *Davis v. State*, 235 Ga. App. 10, 11 (1) (507 SE2d 827) (1998).