(No. 91522.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appel-
lant, v. ROBERT S. LIDSTER, Appellee.

*Opinion filed October 18, 2002.*

2

THOMAS, J., joined by FITZGERALD and GARMAN, JJ., dissenting.

James E. Ryan, Attorney General, of Springfield, and Joseph E. Birkett, State's Attorney, of Wheaton (Joel D. Bertocchi, Solicitor General, William L. Browers and Karen Kaplan, Assistant Attorneys General, of Chicago, and Norbert J. Goetten, Martin P. Moltz and Sally A. Swiss, of the Office of the State's Attorneys Appellate Prosecutor, of Elgin, of counsel), for the People.

G. Joseph Weller, Deputy Defender, of the Office of the State Appellate Defender, of Elgin, and Elaine Sofferman and Jay Wiegman, of Wiegman & Farmer, of Somonauk, for appellee.

James G. Sotos and Dana M. Shannon, of Hervas, Sotos, Condon & Bersani, P.C., of Itasca, for *amicus curiae* Illinois Association of Chiefs of Police.

JUSTICE FREEMAN delivered the opinion of the court:

Following a bench trial, the circuit court of Du Page County convicted defendant of driving under the influence of alcohol (625 ILCS 5/11—501(a)(2) (West 1996)). The appellate court found that the roadblock where the police arrested defendant did not comply with the constitutional standards set forth in *City of Indianapolis v. Edmond*, 531 U.S. 32, 148 L. Ed. 2d 333, 121 S. Ct. 447 (2000). Accordingly, the appellate court reversed defen-

dant's conviction. 319 Ill. App. 3d 825. We granted the State's petition for leave to appeal (177 Ill. 2d R. 315(a)), and allowed the Illinois Association of Chiefs of Police to file an *amicus curiae* brief in support of the State. For the reasons that follow, we affirm the judgment of the appellate court.

## BACKGROUND

On August 30, 1997, the Lombard police department set up a roadblock on North Avenue in Lombard, Illinois. A police officer stopped defendant at the roadblock and directed him to a side street where another police officer had defendant perform several field-sobriety tests. Defendant failed a number of the tests and was taken into custody.

Defendant was subsequently charged with the offense of driving under the influence of alcohol. He filed a motion to quash his arrest and suppress evidence. At the hearing on the motion, Detective Ray Vasil testified that Lieutenant Glennon, third in command at the Lombard police department, authorized the roadblock. The purpose of the roadblock was to obtain information from motorists regarding a hit-and-run accident that took place one week earlier, at the same location, and at the same time of day. In particular, the police wanted information regarding a Ford Bronco or full-sized pickup truck implicated in the accident.

The Lombard police department has a general order regarding the use of roadblocks. The order, however, does not contain guidelines regarding the use of roadblocks to obtain information from crime witnesses. The roadblock at issue was not videotaped. Further, the police did not publicize the roadblock.

Between 6 and 12 police vehicles participated in the roadblock. Detective Vasil wore an orange reflective vest with the word ''Police'' on it, and stood between the eastbound lanes of North Avenue, 15 feet from the

roadblock. A line of cars formed at the roadblock. As each vehicle pulled up to Detective Vasil, he handed a flyer to the driver of the vehicle requesting information regarding the accident. Because defendant's Mazda minivan almost hit him, Detective Vasil requested defendant's driver's license and insurance card. Detective Vasil smelled alcohol on defendant's breath and noticed that defendant's speech was slurred. Detective Vasil directed defendant to a side street where Detective Roy Newton had defendant perform several sobriety tests.

The trial court denied defendant's motion.

At defendant's subsequent bench trial, Detective Newton testified that he was assigned to the corner of North Avenue and Craig. His duties were to ensure that drivers did not skirt the roadblock and to provide help to the officers in the event they experienced any problems with the vehicles or drivers stopped at the roadblock. The officers at the roadblock directed several cars, including defendant's vehicle, to Detective Newton's location. At Detective Newton's request, defendant produced a driver's license and insurance information. Detective Newton then had defendant perform several sobriety tests and placed defendant under arrest.

The court found defendant guilty of driving under the influence of alcohol. The court sentenced defendant to one year of conditional discharge and required that defendant participate in counseling, complete 14 days in the "Sheriff's Work Alternative Program," and pay a fine of $200.

## ANALYSIS

As noted above, the appellate court relied on *Edmond*, 531 U.S. 32, 148 L. Ed. 2d 333, 121 S. Ct. 447, in finding the roadblock at issue invalid. In *Edmond*, the United States Supreme Court invalidated checkpoints set up by the police on Indianapolis roads in an effort to interdict unlawful drugs. Initially, the Court observed:

"The Fourth Amendment requires that searches and seizures be reasonable. A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing. [Citation.] While such suspicion is not an 'irreducible' component of reasonableness [citation], we have recognized only limited circumstances in which the usual rule does not apply. For example, we have upheld certain regimes of suspicionless searches where the program was designed to serve 'special needs, beyond the normal need for law enforcement.' [Citations.] ***

We have also upheld brief, suspicionless seizures of motorists at a fixed Border Patrol checkpoint designed to intercept illegal aliens, *Martinez-Fuerte*, [428 U.S. 543, 49 L. Ed. 2d 1116, 96 S. Ct. 3074 (1976)], and at a sobriety checkpoint aimed at removing drunk drivers from the road, *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444[, 110 L. Ed. 2d 412, 110 S. Ct. 2481] (1990)." *Edmond*, 531 U.S. at 37, 148 L. Ed. 2d at 340-41, 121 S. Ct. at 451-52.

The *Edmond* Court then reviewed its decisions in *Martinez-Fuerte* and *Sitz*, detailing the need for the checkpoints at issue and the important governmental interests they served. The Court observed:

"We have never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing. Rather, our checkpoint cases have recognized only limited exceptions to the general rule that a seizure must be accompanied by some measure of individualized suspicion. We suggested in *Prouse* that we would not credit the 'general interest in crime control' as justification for a regime of suspicionless stops. [*Delaware v. Prouse*, 440 U.S. 648, 659 n.18, 59 L. Ed. 2d 660, 671 n.18, 99 S. Ct. 1391, 1399 n.18 (1979).] Consistent with this suggestion, each of the checkpoint programs that we have approved was designed primarily to serve purposes closely related to the problems of policing the border or the necessity of ensuring roadway safety." *Edmond*, 531 U.S. at 41, 148 L. Ed. 2d at 343, 121 S. Ct. at 454.

The *Edmond* Court firmly rejected the suggestion that the Indianapolis checkpoints could be upheld pursuant to *Martinez-Fuerte* and *Sitz*:

"Petitioners propose several ways in which the narcotics-detection purpose of the instant checkpoint program may instead resemble the primary purposes of the checkpoints in *Sitz* and *Martinez-Fuerte*. Petitioners state that the checkpoints in those cases had the same ultimate purpose of arresting those suspected of committing crimes. *** Securing the border and apprehending drunk drivers are, of course, law enforcement activities, and law enforcement officers employ arrests and criminal prosecutions in pursuit of these goals. [Citations.] If we were to rest the case at this high level of generality, there would be little check on the ability of the authorities to construct roadblocks for almost any conceivable law enforcement purpose. Without drawing the line at roadblocks designed primarily to serve the general interest in crime control, the Fourth Amendment would do little to prevent such intrusions from becoming a routine part of American life." *Edmond*, 531 U.S. at 42, 148 L. Ed. 2d at 343-44, 121 S. Ct. at 454.

The *Edmond* Court concluded that the Indianapolis checkpoints were invalid, stating:

"The primary purpose of the Indianapolis narcotics checkpoints is in the end to advance 'the general interest in crime control,' [citation]. We decline to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes. We cannot sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime." *Edmond*, 531 U.S. at 44, 148 L. Ed. 2d at 345, 121 S. Ct. at 455.

See also *Ferguson v. City of Charleston*, 532 U.S. 67, 81, 149 L. Ed. 2d 205, 218-19, 121 S. Ct. 1281, 1290 (2001) (in invalidating a program at a state hospital whereby urine samples from pregnant women were tested for drugs and the results communicated to the police, the Court stated: "Respondents argue in essence that their ultimate purpose—namely, protecting the health of both mother and child—is a beneficent one. In *Chandler* [*v. Miller*, 520 U.S. 305, 137 L. Ed. 2d 513, 117 S. Ct. 1295

(1997)], however, we did not simply accept the State's invocation of a 'special need.' Instead, we carried out a 'close review' of the scheme at issue before concluding that the need in question was not 'special,' as that term has been defined in our cases. [Citation.] In this case, a review of the M-7 policy plainly reveals that the purpose actually served by the [hospital] searches 'is ultimately indistinguishable from the general interest in crime control.' *Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000)'').

In the present case, the appellate court held the roadblock at issue invalid under *Edmond*. The appellate court noted ''that the roadblock's ostensible purpose was to seek evidence of 'ordinary criminal wrongdoing.' '' 319 Ill. App. 3d at 828. The court concluded ''[t]his is the type of routine investigative work that the police must do every day and does not justify the extraordinary means chosen to further the investigation.'' 319 Ill. App. 3d at 828.

The State asserts that *Edmond* is distinguishable because the roadblock at issue had a specific purpose of assisting the authorities in solving a crime that had already been committed and was known to the police. Thus, police efforts were not directed at general crime control. Unlike in *Edmond*, the Lombard police department did not seek to interrogate and inspect motorists to ferret out evidence that the motorists themselves had committed crime that was as yet unknown to police. Defendant was only subjected to further investigation because he narrowly missed hitting an officer in the area where vehicles were stopped.

The State's interpretation of *Edmond* is incorrect. First, as the Court reaffirmed in *Edmond*, the general rule is that ''a search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing.'' *Edmond*, 531 U.S. at 37, 148 L. Ed. 2d at

340, 121 S. Ct. at 451. The checkpoints upheld in *Martinez-Fuerte*, 428 U.S. 543, 49 L. Ed. 2d 1116, 96 S. Ct. 3074 (1976) (immigration checkpoints located near the Mexican border), and *Michigan Department of State Police v. Sitz*, 496 U.S. 444, 110 L. Ed. 2d 412, 110 S. Ct. 2481 (1990) (sobriety checkpoint), are "limited exceptions to the general rule." *Edmond*, 531 U.S. at 41, 148 L. Ed. 2d at 343, 121 S. Ct. at 454. Certainly the Lombard roadblock does not fall within the scope of the limited exceptions heretofore approved by the Supreme Court.

Second, the Court in *Edmond* was keenly aware that an exception for roadblocks "designed primarily to serve the general interest in crime control" would abrogate the general rule requiring individualized suspicion of wrongdoing. See 4 W. LaFave, Search & Seizure § 9.6 (3d ed. Supp. 2002). Accordingly, the Court drew a bright line that when the primary purpose of a roadblock is general crime control, the roadblock is unconstitutional. The Court explained:

> "Without drawing the line at roadblocks designed primarily to serve the general interest in crime control, the Fourth Amendment would do little to prevent such intrusions from becoming a routine part of American life." *Edmond*, 531 U.S. at 42, 148 L. Ed. 2d at 344, 121 S. Ct. at 454.

The Court declined "to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes." *Edmond*, 531 U.S. at 44, 148 L. Ed. 2d at 345, 121 S. Ct. at 455.

In the case at bar, the State ignores the concerns expressed by the Court in *Edmond*. In spite of the clear admonishment in *Edmond* against the use of roadblocks to advance "the general interest in crime control," the State requests that we allow a roadblock for precisely that purpose.

Third, the State finds a distinction between gather-

ing information leading to the arrest and prosecution of a motorist as the perpetrator of a crime, and gathering information from a motorist leading to the identification of *another* motorist as the perpetrator of a crime. According to the State, gathering information leading to the arrest and prosecution of a motorist as the perpetrator of a crime is a part of general crime control. However, the State maintains that gathering information from a motorist leading to the identification of *another* motorist as the perpetrator of a crime is *not* considered a part of general crime control. Taking the State's reasoning a step further, a police investigation tool such as canvassing a neighborhood to find identification witnesses to a crime is not considered to be a part of general crime control. In the State's view, crime control involves arresting the perpetrator directly; it does not involve gathering information leading to the arrest of the perpetrator. We must reject this contention. In investigating and solving any crime, police efforts are directed at general crime control. This holds true whether the police happen upon the perpetrator of the crime at the roadblock or obtain information from a roadblock detainee identifying the perpetrator of the crime.

Lastly, an exception for informational roadblocks has the potential to make roadblocks "a routine part of American life." *Edmond*, 531 U.S. at 42, 148 L. Ed. 2d at 344, 121 S. Ct. at 454. In 2000, 870 murders, 49,652 assaults, 25,168 robberies, 77,947 burglaries, 306,805 thefts, 55,222 motor vehicle thefts, and 2,899 arsons were known by police to have been committed in Illinois. J. Fitch, 2001 Illinois Statistical Abstract 764 (16th ed. 2001). Of those, 706 murders, 31,655 assaults, 21,691 robberies, 41,464 burglaries, 168,890 thefts, 45,083 motor vehicle thefts, and 1,525 arsons were known by police to have been committed in Cook County. J. Fitch, 2001 Illinois Statistical Abstract 764 (16th ed. 2001). In the

City of Chicago, there were 627 murders, 26,660 assaults, 19,449 robberies, 28,401 burglaries, 105,728 thefts, 35,570 motor vehicle thefts and 1,106 arsons. J. Fitch, 2001 Illinois Statistical Abstract 766 (16th ed. 2001). Should the police have been allowed to set up roadblocks to obtain information from potential witnesses for each murder? What of a robbery, an aggravated criminal sexual assault, an arson or any other serious crime? According to the State, for a period of at least a week after each crime, police could set up roadblocks with the specific purpose of making inquiries of persons who were possibly witnesses to a crime. The troubling specter then arises that the streets of Cook County, or at least the streets of Chicago, would be adorned with roadblocks, an outcome clearly unacceptable under *Edmond*.

*Amicus* suggests that exigent circumstances justified the use of the roadblock. *Amicus* asserts that police needed to act quickly to contact possible witnesses or else risk losing vital information. The Court in *Edmond* left open the possibility that an emergency may justify a law enforcement roadblock. The Court explained:

"Of course, there are circumstances that may justify a law enforcement checkpoint where the primary purpose would otherwise, but for some emergency, relate to ordinary crime control. For example, as the Court of Appeals noted, the Fourth Amendment would almost certainly permit an appropriately tailored roadblock set up to thwart an imminent terrorist attack or to catch a dangerous criminal who is likely to flee by way of a particular route. [Citation.] The exigencies created by these scenarios are far removed from the circumstances under which authorities might simply stop cars as a matter of course to see if there just happens to be a felon leaving the jurisdiction. While we do not limit the purposes that may justify a checkpoint program to any rigid set of categories, we decline to approve a program whose primary purpose is ultimately indistinguishable from the general interest in crime control." *Edmond*, 531 U.S. at 44, 148 L. Ed. 2d at 345, 121 S. Ct. at 455.

In the present case, the hit-and-run accident happened a week before the roadblock. There was no indication that the motorist involved posed any further danger to local residents or, indeed, that the motorist remained in the vicinity. There was also no indication that the motorist was driving recklessly or was driving under the influence of alcohol. While this court understands the efforts of the Lombard police department to obtain information leading to the identification of the motorist, the limited, exigent circumstances of the nature identified by the Supreme Court in *Edmond* are not present in the matter at bar. Absent such exigent circumstances, the fourth amendment's prohibition against suspicionless seizures should not give way to the normal needs of law enforcement, be they identified as crime control, criminal investigation or canvassing efforts to obtain information leading to the identification and apprehension of the perpetrator of a crime.

The State and *amicus* fail in their attempts to distinguish *Edmond*. *Edmond* clarifies that "[w]hen law enforcement authorities pursue primarily general crime control purposes at checkpoints such as here, *** stops can only be justified by some quantum of individualized suspicion." *Edmond*, 531 U.S. at 47, 148 L. Ed. 2d at 347, 121 S. Ct. at 457.

## CONCLUSION

The laws of this state require that a motorist remain at the scene of an accident. In the present case, the motorist left the scene of the accident. The police set up a roadblock to obtain information regarding the identity of the motorist. The goals of the police in doing so are laudable.

This court is sympathetic to the efforts of the police in identifying the motorist involved in the accident. Sympathy, however, does not justify the roadblock at issue. As the Supreme Court observed in *Almeida-Sanchez*

*v. United States*, 413 U.S. 266, 37 L. Ed. 2d 596, 93 S. Ct. 2535 (1973):

"The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards. It is well to recall the words of Mr. Justice Jackson, soon after his return from the Nuremberg Trials:

'These [fourth amendment rights], I protest, are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government.' *Brinegar v. United States*, 338 U.S. 160, 180, 93 L. Ed. 1879, 69 S. Ct. 1302 (Jackson, J., dissenting)." *Almeida-Sanchez*, 413 U.S. at 273-74, 37 L. Ed. 2d at 603, 93 S. Ct. at 2540.

The right of an individual to be free from unreasonable searches and seizures is an indispensable freedom, not a mere luxury. It cannot give way in the face of a temporary need for the police to obtain information regarding the identity of the motorist at issue. As the protector of the constitutional rights of all citizens of this state, this court is commanded to draw a "line at roadblocks designed primarily to serve the general interest in crime control." *Edmond*, 531 U.S. at 42, 148 L. Ed. 2d at 344, 121 S. Ct. at 454. Without such a line, the fourth amendment will do little to prevent intrusive searches and seizures from becoming a routine part of American life. *Edmond*, 531 U.S. at 42, 148 L. Ed. 2d at 344, 121 S. Ct. at 454.

The judgment of the appellate court is affirmed.

*Affirmed.*

JUSTICE THOMAS, dissenting:

The majority has misconstrued *City of Indianapolis*

*v. Edmond*, 531 U.S. 32, 148 L. Ed. 2d 333, 121 S. Ct. 447 (2000), by reading it to prohibit the type of roadblock at issue here. *Edmond* is factually distinguishable, and its language does not condemn the strictly informational roadblock instituted by the Lombard police department in this case. Additionally, I believe that the majority erroneously creates a *per se* rule that roadblocks involving police canvassing for information about a specific, known crime are constitutionally impermissible. Consequently, the majority abrogates the balancing test of *Brown v. Texas*, 443 U.S. 47, 61 L. Ed. 2d 357, 99 S. Ct. 2637 (1979), which is normally applied in roadblock cases. For all of these reasons and as more fully explained below, I respectfully dissent.

I. *Edmond* Is Distinguishable and Is Not Determinative

In *Edmond*, the Court considered the constitutionality of an Indianapolis checkpoint program that had as its primary purpose the interdiction of illegal drugs. In contrast to the 10- to 15-second stops in the present case, which were conducted for the sole purpose of handing out an informational flyer, the total duration of the stops in *Edmond* lasted between two and five minutes. Moreover, unlike the roadblock here, drivers in *Edmond* were asked to produce a license and registration while an officer looked for signs of impairment. The officer also conducted an open-view examination of the vehicle from the outside. Meanwhile, a narcotics-detection dog was walked around the outside of the stopped vehicle. Thus, the nature, purpose, and scope of the roadblocks were completely different in the two cases.

In the course of discussing its prior roadblock seizure cases, the *Edmond* Court declared that it had never approved "a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing." *Edmond*, 531 U.S. at 38, 148 L. Ed. 2d at 341, 121 S. Ct. at 452. The Court noted that in *United States v. Martinez-*

14

*Fuerte*, 428 U.S. 543, 49 L. Ed. 2d 1116, 96 S. Ct. 3074 (1976), it upheld a highway checkpoint established for the purposes of intercepting illegal aliens because of the significant interest in policing the nation's borders (*Edmond*, 531 U.S. at 38, 148 L. Ed. 2d at 341, 121 S. Ct. at 452), and in *Michigan Department of State Police v. Sitz*, 496 U.S. 444, 110 L. Ed. 2d 412, 110 S. Ct. 2481 (1990), it upheld a police roadblock instituted to detect intoxicated drivers because of the gravity of the drunken driving problem and the obvious connection between highway safety and the law enforcement practice at issue (*Edmond*, 531 U.S. at 39, 148 L. Ed. 2d at 342, 121 S. Ct. at 453). The Court also discussed *Delaware v. Prouse*, 440 U.S. 648, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979), which invalidated a discretionary, suspicionless stop of a single motorist to check his license and registration, noting that the officer's conduct in that case was unconstitutional primarily because of his exercise of discretion without standards promulgated by the police department. *Edmond*, 531 U.S. at 39, 148 L. Ed. 2d at 342, 121 S. Ct. at 453. The Court noted with approval the suggestion in *Prouse* that the questioning of all oncoming traffic at roadblock-type stops to ensure that only those qualified to operate a vehicle are permitted to do so would be a lawful means of serving the interest in highway safety, but it specifically pointed out that it considered the purpose of such a hypothetical roadblock "to be distinct from a general purpose of investigating crime." *Edmond*, 531 U.S. at 39, 148 L. Ed. 2d at 342, 121 S. Ct. at 453.

In concluding that a checkpoint designed primarily to catch drug offenders and interdict illegal narcotics violates the fourth amendment, the *Edmond* Court stated the following:

"We decline to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes. We cannot sanction stops *justified only by the*

*generalized and ever-present possibility that interrogation
and inspection may reveal that any given motorist has com-
mitted some crime.*" (Emphasis added.) *Edmond*, 531 U.S.
at 44, 148 L. Ed. 2d at 345, 121 S. Ct. at 455.

In applying *Edmond* to the present case, the majority
erroneously seizes upon language in *Edmond* that
prohibits roadblocks "designed primarily to serve the
general interest in crime control," or stated another way,
the "ordinary enterprise of crime control," while ignor-
ing other language in the *Edmond* opinion modifying
and explaining what is meant by "ordinary crime
control." I believe that the majority improperly relies on
the first sentence in the above-quoted passage from *Ed-
mond* and disregards the second sentence, which, modify-
ing the first, plainly proscribes checkpoints for the
purpose of exposing unknown crimes to the police. *Ed-
mond* should not be read as categorically enjoining police
from stopping all vehicles pursuant to an informational
roadblock designed to make reasonable inquiry of persons
who were possibly witnesses to a specific crime. Instead,
I would find that absent either exigent circumstances or
a sufficient relationship to highway safety or border
concerns, *Edmond* categorically prohibits only check-
points whose primary purpose lies in discovering that the
subjects of the seizure have committed some crime (*Ed-
mond*, 531 U.S. at 43-44, 148 L. Ed. 2d at 345, 121 S. Ct.
at 455). Again, the Court in *Edmond* specifically noted
that it could not sanction stops "justified only by the
generalized and ever-present possibility that interroga-
tion and inspection may reveal that *any given motorist
has committed some crime.*" (Emphasis added.) *Edmond*,
531 U.S. at 44, 148 L. Ed. 2d at 345, 121 S. Ct. at 455.

Here, the roadblock at issue had a specific purpose of
assisting the authorities in solving a crime that had
already been committed and was known to the police.
Thus, police efforts were not directed at general crime
control within the meaning of *Edmond*. Unlike in *Ed-*

*mond,* the Lombard police department did not seek to interrogate and inspect motorists to ferret out evidence that the motorists themselves had committed a crime that was as yet unknown to police. The present defendant was subjected to investigation only because his erratic driving nearly resulted in his collision with an officer in the area where vehicles were stopped for purposes of handing out flyers. Once the officers witnessed defendant's erratic driving, they clearly had reasonable suspicion to detain defendant for further inquiry. See *People v. Sorenson,* 196 Ill. 2d 425, 433 (2001); *People v. Brodack,* 296 Ill. App. 3d 71, 74 (1998). As the Court in *Edmond* recognized, its holding was not meant to "impair the ability of police officers to act appropriately upon information that they properly learn during a checkpoint stop justified by a lawful primary purpose, even where such action may result in the arrest of a motorist for an offense unrelated to that purpose." *Edmond,* 531 U.S. at 48, 148 L. Ed. 2d at 347, 121 S. Ct. at 457.

While *Edmond* stated that "[a] search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing" (*Edmond,* 531 U.S. at 37, 148 L. Ed. 2d at 340, 121 S. Ct. at 451), it did not create a *per se* rule announcing that henceforward only roadblocks involving DUI checkpoints or border control would ever be considered constitutional. Instead, *Edmond* discussed with approval the rationale of *Prouse,* which involved a license check. The Court noted that the spot check in that case was invalid because of a lack of standards to guide the discretion of the patrolling officer. *Edmond,* 531 U.S. at 39, 148 L. Ed. 2d at 342, 121 S. Ct. at 453. As previously noted, the *Edmond* Court approved of the assertion in *Prouse* that the questioning of all oncoming traffic at roadblock-type stops to ensure that only those qualified to operate a vehicle are permitted to do so would

be a lawful means of serving the interest of highway safety, and that it considered the purpose of such a hypothetical roadblock "to be distinct from a general purpose of investigating crime." *Edmond*, 531 U.S. at 39, 148 L. Ed. 2d at 342, 121 S. Ct. at 453.

Aside from the fact that the roadblock in this case was distinct from general crime control because it was not designed to detect through "interrogation and inspection *** that any given motorist has committed some crime" (*Edmond*, 531 U.S. at 44, 148 L. Ed. 2d at 345, 121 S. Ct. at 455), the purpose of the present roadblock is also distinct from general crime control because of its connection to highway safety just as the hypothetical roadblock in *Prouse* was distinct from general crime control. The canvassing for information about a deadly hit-and-run crime that happened on the roadway would serve the purpose of highway safety in a similar fashion to checking licenses to ensure that only qualified drivers are operating motor vehicles.

The conclusion that *Edmond* does not compel the result reached by the majority here is supported by the recent decision of the Supreme Court of Virginia in *Burns v. Commonwealth*, 261 Va. 307, 541 S.E.2d 872 (2001), which is the only other reported case decided in the aftermath of *Edmond* to assess the validity of a roadblock established with the hope of discovering witnesses to a specific, known crime, as opposed to a roadblock established to discover evidence of crime in general. There, police set up a roadblock at a particular location on September 21-22, 1998, between the hours of 7 p.m. and 11:30 a.m. in the hopes of discovering witnesses to a brutal murder that occurred in a nearby house between the same hours on September 20-21, 1998. According to the sheriff who decided to establish the roadblock, its purpose was to " 'canvas drivers who were passing through the area, to see whether they had seen or heard

18

anything' during the time period when the crime had probably been committed the previous day." *Burns*, 261 Va. at 322, 541 S.E.2d at 883. The sheriff also directed officers to stop all vehicles and to ask the operators if they had been through that section during the time in question and, if they had, whether they had seen anything of a suspicious nature in and around the victim's house. Fortuitously, the defendant, who was a relative of the victim, was stopped and eventually made statements implicating himself in the crime.

In holding that the roadblock did not violate the fourth amendment, the Supreme Court of Virginia first considered and weighed the factors enunciated in *Brown*. *Burns*, 261 Va. at 322, 541 S.E.2d at 883. The court concluded that the murder was a matter of grave public concern and that the roadblock advanced that concern by aiding in the investigation of the crime. *Burns*, 261 Va. at 322, 541 S.E.2d at 883. Furthermore, the court emphasized that the roadblock was carried out pursuant to an explicit plan that contained neutral criteria and limited the discretion and conduct of the law enforcement officers charged with the responsibility of stopping vehicles at the roadblock. *Burns*, 261 Va. at 322, 541 S.E.2d at 883.

The Virginia Supreme Court then distinguished *Edmond*, noting that while the roadblock in the case before it was obviously not related to policing the borders or ensuring highway safety, its purpose was not "simply to investigate ordinary criminal wrongdoing as was the checkpoint in *Edmond*." *Burns*, 261 Va. at 323, 541 S.E.2d at 883. Instead, it noted, the roadblock was "specifically designed to investigate a particular murder that had recently occurred in the area where the roadblock was placed," and police "were not stopping vehicles merely to discover evidence of crimes in general." *Burns*, 261 Va. at 323-24, 541 S.E.2d at 883-84. Finally, the court

noted that *Edmond* had recognized that " 'there are circumstances that may justify a law enforcement checkpoint where the primary purpose would otherwise, but for some emergency, relate to ordinary crime control.' " *Burns*, 261 Va. at 323, 541 S.E.2d at 883, quoting *Edmond*, 531 U.S. at 44, 148 L. Ed. 2d at 345, 121 S. Ct. at 455. The court concluded that the roadblock fell within the exception recognized by *Edmond* and, therefore, did not contravene the fourth amendment. *Burns*, 261 Va. at 324, 541 S.E.2d at 884.

Similarly, I would find that the roadblock in the present case did not violate fourth amendment principles. At the time police set up the roadblock, the offender remained at large with his identity unknown. Thus, he continued to pose a safety risk to others on the road. Moreover, even if the perpetrator was not an immediate threat, the same exigent circumstances found to exist in *Burns* were present here because police had to move relatively quickly to canvass the area at the appropriate time or risk losing information about the crime. At any rate, the underlying purpose behind the roadblock furthered highway safety because of its potential to solve this particular road crime. Importantly, police did not stop vehicles to discover evidence of crime in general, and the roadblock was appropriately tailored in terms of timing and placement to provide for the most reasonably likely opportunity of discovering further information about the crime. Also like *Burns*, the intrusion on motorists in the present case—they were merely stopped long enough to alert them of the crime and to ask them if they had seen anything—was much less than the intrusion in *Edmond*.

Additionally, I note that the roadblock in the present case was perhaps even more justifiable than the one in *Burns* when comparing the two cases with *Edmond*. Here there was the additional connection to roadway safety in

that the crime was accomplished through the use of an automobile at the same location on the highway where the roadblock was eventually conducted. Under these circumstances, I would hold that a police roadblock does not *per se* violate the fourth amendment proscription against unreasonable searches and seizures where the roadblock is designed to gather information about a specific, known crime that is a matter of grave public concern.

II. Application of the *Brown* Balancing Test

Given my conclusion that *Edmond* does not categorically prohibit the type of roadblock at issue in the present case, I believe that it is incumbent upon this court to assess the validity of the roadblock in relation to the factors noted in *Brown v. Texas*, 443 U.S. 47, 61 L. Ed. 2d 357, 99 S. Ct. 2637 (1979). It is well settled that a vehicle stop at a roadblock or highway checkpoint effectuates a seizure within the meaning of the fourth amendment. *Edmond*, 531 U.S. at 40, 148 L. Ed. 2d at 342, 121 S. Ct. at 453; *People v. Bartley*, 109 Ill. 2d 273, 280 (1985). However, a roadblock where individuals are stopped without probable cause or individualized suspicion is not a *per se* violation of the fourth amendment; the question of whether a roadblock violates the fourth amendment is one of reasonableness, requiring the weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty. *Brown*, 443 U.S. at 50-51, 61 L. Ed. 2d at 361-62, 99 S. Ct. at 2640; *Bartley*, 109 Ill. 2d at 280.

The factors set forth in *Brown* require a court to balance the State's asserted interest for the roadblock against the "objective" and "subjective" intrusion on the motorist. *Prouse*, 440 U.S. at 656, 59 L. Ed. 2d at 669, 99 S. Ct. at 1397; *Martinez-Fuerte*, 428 U.S. at 558, 49 L. Ed. 2d at 1128, 96 S. Ct. at 3083. The objective intrusion

is measured by such factors as the length of the stop, the nature of the questioning, and whether a search is conducted; the subjective intrusion relates to the concern, fright, or annoyance on the part of the motorist. *Bartley*, 109 Ill. 2d at 282. The crucial inquiry in assessing the subjective intrusion involves a consideration of whether the field officers were acting with unbridled discretion. *Bartley*, 109 Ill. 2d at 289. Factors important in that inquiry include the following: (1) whether the decision to establish the roadblock and its location are made by supervisory personnel of the police department such as a lieutenant or captain; (2) whether all vehicles are stopped in a systematic, preestablished manner such as stopping all traffic in a given direction; (3) whether guidelines exist on the operation of the roadblock; (4) whether advance publicity of the intention of police to establish the roadblock was given; and (5) whether a sufficient show of the official nature of the operation was made through such means as the presence of a number of police vehicles with flashing lights and uniformed officers. *Bartley*, 109 Ill. 2d at 288-91.

Application of the *Brown* factors to the instant case leads to the conclusion that the roadblock established by the Lombard police department passed constitutional standards. The department made the decision to set up the roadblock because of a fatal hit-and-run accident that had been committed in the precise area of the roadblock, and officials did not know the identity of the offender responsible for the crime. That the perpetrator was still at large was indeed a matter of grave public concern, and the roadblock advanced that concern by aiding in the investigation of the crime. Moreover, the timing of the roadblock, exactly one week after the crime at approximately the same time of day, was purposely designed to stop motorists who might routinely travel that route at the end of their work shift and thus was

narrowly tailored for maximum effectiveness. Thus, I would find that the State's interest in the roadblock was sufficient to outweigh a minimal intrusion on the motorist.

Additionally, the intrusion in this case was in fact minimal. Objectively, the physical nature of the intrusion was insubstantial. Motorists were detained approximately 10 to 15 seconds, just long enough for police to hand out a flyer and alert motorists of the accident the previous week. Drivers were not asked for their names, driver's licenses, or insurance cards and they were not checked for seat belt violations. In relation to the vehicle occupants subjected to the stop, there was indisputably no crime-detection purpose behind the roadblock.

Likewise, the subjective nature of the intrusion was minimal. The record indicates that a high-ranking lieutenant in the police department called the meeting to inform the officers that they were to participate in the roadblock. Vehicles were stopped in a systematic and preestablished manner—all eastbound traffic was stopped and this was not a roving patrol. Although an officer participating in the roadblock admitted that there were no written guidelines for "informational roadblocks" contained in the department's written guidelines, the department did have guidelines for roadblocks generally, and there is no indication that the officers in the field did not follow the preestablished procedure for this particular roadblock. Although the roadblock itself may not have been publicized in advance, it is clear that the basis for the roadblock had been well-publicized, which would have likely minimized any apprehension motorists may have otherwise experienced upon encountering it. Finally, any anxiety motorists may have felt was dissipated by the official nature of the operation—there was a large number of emergency vehicles present with flashing lights and officers clad in orange police vests.

### III. Proliferation of Roadblocks

Lastly, I note that the majority cites statistics of the thousands of felonies that occur in Illinois each year to support its argument that, if this particular roadblock were upheld, roadblocks generally would become a routine way of life. The statistics cited by the majority, however, are irrelevant to this discussion, and the majority's argument based thereon is unfounded and unpersuasive. The majority misses the point that the justification for this particular roadblock was that a fatal hit-and-run accident had occurred on the highway, that the roadblock was also justified by its connection to highway safety, and that it amounted to mere canvassing for information. Missing from the list of statistics cited by the majority is the amount of *fatal* hit-and-run accidents that occur on major thoroughfares like Route 64, the scene of the fatal vehicular crime that lead to the roadblock in this case.

The majority's reasoning is also defused by the reality that the amount of roadblocks would be limited by the scarce public resources available to police. Moreover, even when a police department determines that it is a justifiable use of their limited manpower and resources to set up an informational roadblock, the constitutionality of the roadblock would still be subject to the three-prong reasonableness test of *Brown* as well as the principles set forth in *Edmond*.

### IV. Conclusion

For the foregoing reasons, I would reverse the judgment of the appellate court and reinstate defendant's conviction. Accordingly, I respectfully dissent.

JUSTICES FITZGERALD and GARMAN join in this dissent.