## A04A0526. STRICKLAND v. THE STATE.
### (594 SE2d 711)

ELDRIDGE, Judge.

A Stephens County jury found Keldon Strickland guilty of trafficking in cocaine, misdemeanor possession of marijuana, obstruction of an officer, and operating a vehicle without a valid license tag. He appeals and claims the trial court erred in denying his motion to suppress because the drugs at issue were found pursuant to a stop of his vehicle at an illegal roadblock. As will be discussed below, we agree with Strickland that the roadblock was unconstitutional but find that the discovery of the drugs was sufficiently attenuated from any illegal stop so as to render the drugs admissible. Accordingly, we affirm Strickland's conviction.

A homicide occurred in Toccoa at a residence located in the Pond

and Franklin Streets area; the victim had been shot, and his body was found on January 26, 2002. Officers from the Toccoa Police Department enlisted the aid of T. Attaway from the Georgia Bureau of Investigation to investigate. Subsequently, they experienced little success in identifying the perpetrator. A week after the murder, the officers decided to canvass the intersection of Pond and Franklin Streets at the same time of night that it had been reported gunshots were heard the week before, i.e., sometime between 10:00 p.m. and 2:00 a.m. Agent Attaway testified at the suppression hearing that the officers' efforts included,

> stop[ping] people walking on the roads and stop[ping] people traveling by right in that general area to see if somebody might have saw something, or heard a gunshot, or something of that nature. And that's what we were there for. Was everybody that came through the Pond Street area and the Franklin Street area either walking or driving in a car we were asking them did you hear anything, were you in this area last week.

The only goal for stopping individuals "was to attempt to identify additional leads that would might identify who's responsible for the death of [the victim]." The intersection of Pond Street and Franklin Street where cars were stopped was clearly marked by patrol cars with flashing blue lights. The location was directly across the street from the murder scene. The five or six Toccoa police officers manning the roadblock were in uniform.

At approximately 10:50 p.m., appellant Strickland drove up to the area. It is undisputed that Strickland stopped his vehicle in the street before reaching the roadblock. An officer recognized his Cadillac and informed the others of his presence in the area. Apparently, Strickland had known the victim, and the officers had been wanting to talk to him about the case; there at the scene, Toccoa Police Lieutenant P. Moricz had a large picture of Strickland in order to help identify him on the chance he might be seen that night and could be questioned. Moricz testified at the hearing that Strickland was a "suspect in the murder case" and "we motioned him to pull over." Strickland pulled into a parking lot on Franklin Street.

Attaway and Moricz approached Strickland's car, and Attaway asked for identification. Strickland immediately became agitated and belligerent, yelling that "you got my driver's license." Attaway testified that, "Mr. Strickland, about the time he gets out of the car, he starts to get out of the car on his own." When Strickland saw his photograph in Moricz's hand, he "continues to get louder, and louder,

and louder, and it's almost like he's agitated because this officer has his picture." Attaway testified that Strickland "was putting me on the defense because he's not talking like, you got my — he's hollering at me. . . . [H]e's getting real belligerent. . . . And he's trying to intimidate me and to back me up to start with." Apparently, Strickland was wearing "cargo" pants with numerous pockets that appeared to be bulging. The officers became concerned for their safety because of Strickland's belligerence, his status as a suspect, the fact that "he's right across the street from where this death occurred," and the fact that the perpetrator was still at large. Moricz performed a pat-down "for officers' safety." Thereafter, Moricz "just asked him if he would mind removing everything from his pockets." It is undisputed that Strickland was not under arrest or physically restrained by either officer at the time Moricz made his request. Attaway testified that, at that time, Strickland "pushes Paul [Moricz], and shoves him, and takes off running"; he stated that Strickland,

> kind of goes, kind of twisted and pushing, and he starts again, and he kind of pushes at me, and then he shoves Paul [Moricz], and takes off running. He kind of pushes him back and takes off running. . . . And I'm [(Attaway)] hollering, and he's running, he's running. . . . And about the time I'm around he's really getting further away from me. And I'm telling them, you know, he's running, he's running. . . . And about the time I get to the insurance company I fall — I don't fall, but my knee comes out, popped my knee out.

Moricz testified that "at that time I asked him to remove the items from the pocket, asked him if he would do it. And at that time he pushed Officer Attaway, and pushed me away, and then started running down the road"; he stated that Strickland "pushed me off to the right like that with his elbow and pushed Attaway away, and then he bolted around the car and took off running." Strickland did not testify at the motion hearing or at trial, and the evidence is uncontroverted concerning his physical contact with the officers.

The foot chase concluded when Toccoa Police Supervisor B. Pearson apprehended Strickland; when Attaway arrived on the scene, "they were kind of in a ditch where a culvert was." Pearson "made the comment when he was getting [Strickland] up, make sure you look in that culvert because he was doing something with his hands and shoving some items." Recovered from the culvert were 78.19 grams of cocaine. Several loose rocks of cocaine were also recovered from Strickland's pants pockets, as was a small plastic bag of marijuana.

Further investigation showed that Strickland's vehicle carried an expired drive-out tag. *Held*:

Strickland claims error solely in the trial court's denial of his motion to suppress. He contends the Toccoa Police Department's roadblock did not serve a legitimate primary purpose, and thus, the stop of his vehicle was illegal. We agree with the thrust of Strickland's argument.

It is well established that a vehicle stop at a highway checkpoint effectuates a seizure within the meaning of the Fourth Amendment.[1] The Fourth Amendment requires that searches and seizures be reasonable. A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing.[2] In that regard, the United States Supreme Court has held,

> We have never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing. Rather, our checkpoint cases have recognized only limited exceptions to the general rule that a seizure must be accompanied by some measure of individualized suspicion. We suggested in [*Delaware v. Prouse*, 440 U. S. 648, 663 (99 SC 1391, 59 LE2d 660) (1979),] that we would not credit the "general interest in crime control" as justification for a regime of suspicionless stops. Consistent with this suggestion, each of the checkpoint programs that we have approved was designed primarily to serve purposes closely related to the problems of policing the border or the necessity of ensuring roadway safety.[3]

The roadblock at issue in this case furthered neither of these legitimate goals. Motorists were stopped for a criminal investigation unrelated to road safety. We do not take lightly the importance of a murder investigation, but neither can we excuse the suspicionless seizure of our citizens in a perhaps futile attempt (as in this case) to develop a lead. And we do not find such intrusion to be "minimal." While Toccoa is one of our smaller cities, what is constitutional in Toccoa is constitutional in the metropolitan areas of this State, where crime and crime scenes are exponentially more frequent. As was noted by the supreme court of one of our sister states while deliberating this issue in relation to the City of Chicago, an exception for informational, investigative roadblocks, such as the one at issue

---

[1] *Michigan Dept. of State Police v. Sitz*, 496 U. S. 444 (110 SC 2481, 110 LE2d 412) (1990).

[2] *Chandler v. Miller*, 520 U. S. 305, 308 (117 SC 1295, 137 LE2d 513) (1997).

[3] (Citation omitted.) *City of Indianapolis v. Edmond*, 531 U. S. 32, 41-42 (121 SC 447, 148 LE2d 333) (2000).

here, has the potential to make roadblocks an everyday occurrence.[4] As a consequence,

> [i]f we were to rest the case at this high level of generality, there would be little check on the ability of the authorities to construct roadblocks for almost any conceivable law enforcement purpose. Without drawing the line at roadblocks designed primarily to serve the general interest in crime control, the Fourth Amendment would do little to prevent such intrusions from becoming a routine part of American life.[5]

Accordingly, unless and until the higher courts direct otherwise,[6] we decline to suspend "the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes."[7] Further, none of the exigent circumstances that may justify a generalized "crime control" roadblock are present here.[8]

But we do not find the constitutionality of the roadblock dispositive of this case. Indeed, the evidence appears uncontroverted that Strickland never reached the roadblock. Instead, he stopped his car in the street seemingly to avoid the block and only pulled into a parking lot when directed to do so by Lieutenant Moricz so that officers could question him about the victim's death — as apparently they had been seeking to do for some time. Was this independent *Terry*[9] stop proper? At the suppression hearing, no reasonable suspicion of wrongdoing was articulated as a basis for Strickland's detention; while Strickland was described as a "suspect" in the victim's murder, no rationale was put forward for such designation, and Strickland was wanted only for questioning. Further, there is no evidence the stop was in anyway voluntary in light of Strickland's reluctance to approach the roadblock and belligerence after he was stopped. Accordingly, albeit not for the reasons articulated by brief, we must

---

[4] *Illinois v. Lidster*, 202 Ill.2d 1, 9 (779 NE2d 855) (2002), cert. granted, 538 U. S. 1012 (123 SC 1928, 155 LE2d 847) (2003).

[5] *City of Indianapolis v. Edmond*, supra at 42.

[6] See *Illinois v. Lidster*, supra, 123 SC 1928 (cert. granted to consider whether investigative roadblock to gather information about a week-old hit and run incident passes constitutional muster).

[7] *City of Indianapolis v. Edmond*, supra at 44.

[8] See id. (refusing to reduce legitimate roadblock purposes to a rigid set of categories and recognizing circumstances that may justify a law enforcement checkpoint "where the primary purpose would otherwise, but for some emergency, relate to ordinary crime control," such as "to thwart an imminent terrorist attack or to catch a dangerous criminal who is likely to flee by way of a particular route").

[9] *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968).

agree that the officers' suspicionless stop of Strickland's vehicle was illegal.

Our analysis does not end here, however, because the drugs at issue were not found in Strickland's car or on his person during the course of the improper *Terry* stop. They were found after Strickland shoved the officers, fled from them, and discarded the drugs in a culvert during his subsequent apprehension. And this Court has recognized on numerous occasions that,

> evidence is not impermissibly tainted simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which the objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.[10]

The law is clear that a police officer is not discharging his lawful duty when he performs a *Terry* detention on a citizen without a particularized and objective basis for suspecting criminal activity.[11] Accordingly, during the course of such improper detention, a citizen is free to ignore requests and/or to walk away, and not only will no charge of obstruction lie, any contraband discovered pursuant to the citizen's lawful performance of these acts will in all probability be suppressed.[12] In this case, Strickland properly stopped his car as he was directed to do by the Toccoa officers.[13] Thereafter, he was improperly detained by those officers. He had an absolute right to refuse Lieutenant Moricz's request to empty his pockets; he had an absolute right to walk away. Had he done so and the officers then arrested and searched him, "the fruits of any search likely would have been suppressed."[14]

That, however, is not what Strickland did. The evidence is uncontroverted that — although neither under arrest nor physically

---

[10] (Footnote omitted.) *State v. Stilley*, 261 Ga. App. 868, 870 (584 SE2d 9) (2003); accord, e.g., *Eichelberger v. State*, 252 Ga. App. 801 (557 SE2d 439) (2001); *Patel v. State*, 240 Ga. App. 178, 179 (522 SE2d 760) (1999); *Davis v. State*, 235 Ga. App. 10 (507 SE2d 827) (1998); *Brown v. State*, 188 Ga. App. 184, 187 (372 SE2d 514) (1988). See also *United States v. Bailey*, 691 F2d 1009 (11th Cir. 1982), cert. denied, 461 U. S. 933 (103 SC 2098, 77 LE2d 306) (1983).

[11] *Hamm v. State*, 259 Ga. App. 412, 413 (577 SE2d 85) (2003).

[12] *In the Interest of J. T.*, 239 Ga. App. 756, 759 (521 SE2d 862) (1999); *Holt v. State*, 227 Ga. App. 46 (487 SE2d 629) (1997).

[13] Compare, e.g., *State v. Stilley*, supra at 871 (under OCGA § 40-6-395 (a), driver may not continue to operate a motor vehicle when directed by an officer to stop, even if stop is ultimately held to be improper; "we will not leave 'the determination of whether there is a "legal" basis for a traffic stop to the driver' ") (punctuation and footnote omitted).

[14] (Footnote omitted.) Id.; *Eichelberger v. State*, supra at 804.

restrained in any manner — Strickland physically shoved both officers. This gratuitous act was a battery.[15] Moreover, under the plain language of the battery statute, the aggravated offense of battery against a police officer provides protection for law enforcement officers who are simply attempting in good faith to "[carry] out official duties."[16] While we vigorously condemn any illegal detention of our citizens, we will not find that an improper *Terry* investigative stop justifies the commission of a battery against the officers conducting the stop. "Challenges to even unconstitutional police [actions] must be made in the courts, not on the street."[17]

Strickland's gratuitous act of physically shoving the Toccoa officers was illegal; the fact that he was unlawfully stopped did not render such act legal.[18] "[T]o hold otherwise would encourage persons to resist the police and create potentially violent and dangerous confrontations,"[19] and "a contrary rule would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct."[20] For this reason, a number of jurisdictions, including our own, have recognized that,

> notwithstanding a strong causal connection in fact between [an improper *Terry* stop] and a defendant's response, if the defendant's response is itself a new, distinct crime, then the police constitutionally may arrest the defendant for that crime.[21]

---

[15] OCGA § 16-5-23 (a) ("A person commits the offense of simple battery when he or she either: (1) Intentionally makes physical contact of an insulting or provoking nature with the person of another; or (2) Intentionally causes physical harm to another.").

[16] OCGA § 16-5-23 (e) ("[a]ny person who commits the offense of simple battery against a police officer . . . engaged in carrying out official duties shall, upon conviction thereof, be punished for a misdemeanor of a high and aggravated nature"). Notably, battery against a police officer does not include the qualification that the police be in "lawful discharge" of their official duties as is necessary to prove obstruction; clearly the legislature could have added the additional element of "lawful discharge" contained in the obstruction statute, but chose not to. Under the rules of statutory construction, the omitted language cannot be deemed meaningless. *Gilbert v. Richardson*, 264 Ga. 744, 748 (3) (452 SE2d 476) (1994); *State of Ga. v. C. S. B.*, 250 Ga. 261, 263 (297 SE2d 260) (1982). See also *Pearson v. State*, 224 Ga. App. 467, 468 (480 SE2d 911) (1997) (it is possible to commit the offense of simple battery against a police officer per OCGA § 16-5-23 (e) and not commit an obstruction per OCGA § 16-10-24 (a) or (b)).

[17] *United States v. Crump*, 62 FSupp.2d 560, 568 (D. Conn. 1999).

[18] *United States v. Bailey*, supra at 1017; *State v. Stilley*, supra at 870-871. Compare *State v. Newton*, 227 Ga. App. 394, 397 (4) (489 SE2d 147) (1997) (physical precedent only) (common law doctrine allows one to forcibly resist an illegal *arrest*).

[19] (Citation omitted.) *United States v. Crump*, supra at 568.

[20] (Citation and punctuation omitted.) *United States v. Sprinkle*, 106 F3d 613, 619 (4th Cir. 1997).

[21] *United States v. Bailey*, supra at 1016-1017; accord *State v. Stilley*, supra; *Eichelberger v. State*, supra at 804; *Patel v. State*, supra at 179; *Davis v. State*, supra; *Brown v.*

The offense of battery committed on the Toccoa police officers provided not just reasonable suspicion to further detain, but probable cause to arrest.[22] So, Strickland's subsequent apprehension was proper on either basis. The fact that Strickland was not arrested for the battery of the officers is irrelevant, since a detention supported by probable cause/reasonable suspicion is not rendered illegal when a defendant is not cited for the offense for which he was detained.[23] Moreover, it matters not that the officers did not articulate a proper basis for apprehending Strickland; "[t]he officer's subjective belief that he lacked authority to detain . . . does not control where the facts objectively show the officer had such authority. Because we decide whether reasonable suspicion justifies a detention based on all the objective facts, we are not limited by the detaining officer's subjective opinions."[24] The same objective standard holds true in determining the existence of probable cause to arrest.[25] In this case, the objective facts of record show that a battery on the officers provided an independent basis for Strickland's further detention, rendering his apprehension lawful. Thus, the drugs Strickland threw down were admissible since the battery and subsequent flight, even if triggered by the improper stop, provided an independent basis for the admission of evidence uncovered during such lawful apprehension; the drugs are admissible on these grounds even though they would have been suppressed if uncovered during the unconstitutional stop.[26]

"A trial court's ruling on a motion to suppress will be upheld if it

---

*State*, supra at 187. Accord federal law, e.g., *United States v. Awadallah*, 349 F3d 42, 73 (2nd Cir. 2003); *United States v. Sprinkle*, supra at 619; *United States v. Dawdy*, 46 F3d 1427, 1430-1431 (8th Cir. 1995); *United States v. Pryor*, 32 F3d 1192, 1195-1196 (7th Cir. 1994); *United States v. Smith*, 7 F3d 1164, 1167 (5th Cir. 1993); *United States v. Waupekenay*, 973 F2d 1533, 1537 (10th Cir. 1992); *United States v. Mitchell*, 812 F2d 1250, 1253 (9th Cir. 1987); *United States v. Garcia-Jordan*, 860 F2d 159, 161 (5th Cir. 1988); *United States v. King*, 724 F2d 253, 256 (1st Cir. 1984); *United States v. Garcia*, 516 F2d 318, 319-320 (9th Cir. 1975); *United States v. Nooks*, 446 F2d 1283, 1288 (5th Cir. 1971). Accord state law, e.g., *People v. Smith*, 870 P2d 617 (Colo. App. 1994); *State v. Brocuglio*, 64 Conn. App. 93 (779 A2d 793) (2001); *Commonwealth v. Borges*, 395 Mass. 788 (482 NE2d 314) (1985); *State v. Nelson*, 336 S.C. 186 (519 SE2d 786) (1999); *Bradfield v. State*, 2001 Tenn. Crim. App. LEXIS 183 (March 9, 2001); *State v. Wagstaff*, 204 Utah Adv. Rep. 56 (846 P2d 1311) (1993); *State v. Alexander*, 157 Vt. 60 (595 A2d 282) (1991); *Commonwealth v. Cooper*, 56 Va. Cir. 501 (2001); *State v. Young*, 1999 Wash. App. LEXIS 94 (January 19, 1999).

[22] OCGA § 17-4-20 (a).

[23] *Fuller v. State*, 256 Ga. App. 840, 842 (1) (570 SE2d 43) (2002).

[24] (Citations and punctuation omitted.) *Cole v. State*, 254 Ga. App. 424, 426 (2) (562 SE2d 720) (2002), citing *United States v. Jones*, 990 F2d 405, 408 (8th Cir. 1993), cert. denied, 510 U. S. 934 (114 SC 350, 126 LE2d 314) (1993); accord *Garrett v. State*, 259 Ga. App. 870, 875 (2) (578 SE2d 460) (2002).

[25] *Farmer v. State*, 156 Ga. App. 837, 839 (275 SE2d 774) (1980), citing *United States v. Clark*, 559 F2d 420, 425 (5th Cir. 1977).

[26] *United States v. Bailey*, supra; *United States v. Crump*, supra.

is right for any reason."[27] For the reasons articulated above, we find the denial of Strickland's motion to suppress was correct and conclude that his claims to the contrary are without merit.

*Judgment affirmed. Ruffin, P. J., and Adams, J., concur.*

DECIDED FEBRUARY 11, 2004 

*Clifton, Sanders & Smith, Joshua D. Huckaby*, for appellant.
*Michael H. Crawford, District Attorney, Deborah S. Wilbanks, Assistant District Attorney*, for appellee.

---

[27] (Citation omitted.) *State v. Sims*, 248 Ga. App. 277, 278 (546 SE2d 47) (2001).
[1] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).