A92A2092. FLOYD v. THE STATE.

(427 SE2d 605)

BLACKBURN, Judge.

Keith Bernard Floyd was convicted by a jury of burglary and theft by receiving stolen property. On appeal he contends that the evidence was insufficient to support both convictions. For the following reasons, we affirm both convictions.

Floyd was indicted for the May 17, 1991, burglary of the Wal-Mart store at 2496 Wesley Chapel Road in DeKalb County and theft by receiving a stolen Ryder Truck Rental truck. He represented himself at trial, but at the direction of the trial court a public defender was available to assist him.

State's witness Officer P. M. Johnstone of the DeKalb County Police Department testified that on the evening that Floyd was arrested he (Johnstone) had under surveillance the shopping center in which the Wal-Mart was located. He said that "[b]etween 1:00 and 1:15 a.m. I made a circle around the Wal-Mart complex to make sure there were no other vehicles back there." According to Johnstone, at around 1:28 a.m. he and another officer, Officer Gravitt, were watching the shopping center with binoculars and "observed a Ryder rental truck pass in front of our location driving from west to east toward the rear of the Wal-Mart. . . . We watched to see in which direction it drove. It pulled to the rear driveway entrance to the back of Wal-Mart, and we lost sight of it as it went around the fenced area. We watched the north end of Wal-Mart to make sure it just didn't make a complete circle of the complex and leave the area, but it . . . didn't

show again at the north end, so we knew it had to be behind the Wal-Mart in . . . some location. . . . We waited approximately three minutes . . ., and then we drove to the back of the Wal-Mart. . . . We . . . saw . . . the rental truck that we observed driving past us backed up to a fenced area with the rear overhead door to the van opened all the way and a loading ramp extended and pulled down to the ground. We also saw approximately a four by four hole cut into the chain link fence at the garden center at the rear of the Wal-Mart." Johnstone admitted that, as he had watched the truck drive past, "I couldn't tell who was driving the truck," and that he had not seen how many people were in the truck.

After testifying that the chain link fence was "approximately 12 feet" high and that the garden center had a covering over its top, Johnstone said that he noticed that "there was several cement blocks that were removed from the inside of the fenced area to the outside." According to Johnstone, during his previous inspection of the area between 1:00 and 1:15 a.m. no hole was in the fence and the concrete blocks had not been moved.

Johnstone further testified that "[a]s I looked to my left, I observed a black male subject running toward the west side of the garden center, which would be the front of the store, and he skirted the top of the fence and ran north along the front of the Wal-Mart."

After replying affirmatively to a question whether there was "an opening to get over the fence between the covering and the . . . fence itself," he said that after the subject started running along the front of the Wal-Mart, "I stayed in my unit, advised the other unit in the area, along with Officer Gravitt, that I had a subject on the ground, backed up and drove as quickly as I could to the front." He temporarily lost sight of the suspect but, assisted by some employees of Wal-Mart who had observed the suspect's flight, he "took a right-hand turn around the north end [of the Wal-Mart] and saw no one. All that I found back there was a dumpster. That being the only logical hiding place, . . . I pointed my vehicle toward the dumpster, illuminated it with my headlights, and ordered the person to come out, and I saw a shadow behind the dumpster. The person that was behind there did not comply. And as I approached, he began running again in an easterly direction toward another fenced area that enclosed the Wal-Mart complex." He said that he chased the subject on foot 250 to 300 feet, until he was apprehended by Johnstone and three other officers at "another 12-foot fence to the back of Wal-Mart and he was attempting to scale that also when he was caught."

It was stipulated that the subject who was arrested was Floyd, and it was undisputed that Floyd gave no statement to the police.

Johnstone said that after Floyd was arrested, "[i]nside the, the rental truck, I found a pair of bolt cutters behind the driver's seat,

and . . . on top of the passenger's seat was a plastic water nozzle." [sic] He later testified that the nozzle was the "only property that we found as identified that was taken from the garden center." When Johnstone was asked whether he had seen "anyone else in the area at the time that you were pursuing the defendant," he replied that he had not. Johnstone also said that the key to the truck had been found "[i]nside the defendant's pocket."

On cross-examination Johnstone had the following exchange of questions and answers with Floyd, who was representing himself at trial with the assistance of counsel from the public defender's office: "Q. Let me ask you this, could you tell when you saw the truck, was there more than one person in that truck? A. There were indications at the scene that there had been more than one person there at the scene. Q. Is this, was this a deliberate attempt for you to try to cover yourself just in case that, that you had made a mistake, to say that someone else was at that scene? A. No, sir. There were footprints and tracks in the wet grass beside the garden center."

On redirect examination Johnstone testified that the lighting around the Wal-Mart was "bright," emanating from "poles [which] are approximately 50 to 70 feet above the pavement, probably 6 to 8 individual lamps, multi-wattage. They're very bright, bright enough to light the entire shopping center." When asked about the tracks in the grass that had led him to think someone else had been at the scene, he said that "[t]his area here (indicating) is a grassy area. This would be the driveway here. All this is grass and it leads to a sidewalk, a cement sidewalk. After we had the one subject in custody we went back and there were tracks leading from the cement sidewalk area leading to the road and to the street. That's where we lost the tracks." Johnstone said that Floyd had not fled in the same direction as those tracks.

On recross-examination Johnstone was asked whether he thought there was "enough time to go down there and, and for one person to cut that fence, let up the door, let down the ramp, back up to the fence, and go in, move stuff around, come back out and put stuff back in the truck and then come back inside the fence again." Johnstone said that there had not been enough time for one person, but that "[f]or more than one person, it would be. That's why we said there was additional people there at the scene, because of the tracks leading in the wet grass."

Another state's witness, Floyd Penn, testified that he was an employee of Wal-Mart and had been on duty the evening that Floyd was apprehended. He said that he was familiar with the merchandise that was kept in the garden center, and that lawnmowers were kept in the front of the garden center. He said that after a previous burglary Wal-Mart employees had kept all lawnmowers at the front because it

had better lighting and made them "more difficult to get out." He said that as an additional precaution he had placed the concrete bricks around the inside perimeter of the fence. Penn testified that after the burglary he noticed that one of the mowers had been pushed toward the back of the center.

The operations assistant manager of the store, Glenn L. Murph, testified that no member of the public had been authorized to be in the Wal-Mart, including the garden center, when Floyd was apprehended.

Detective J. M. Carroll of the DeKalb County Police Department testified that he had investigated the scene at the Wal-Mart. According to him, as part of his investigation he determined that the "truck was originated from a Ryder Rental Truck leasing center off of Jimmy Carter Boulevard and I-85," having been "rented out to an individual by the name of Lonvell Pullin. It was rented from the Dealership out in Gwinnett County on April 24th and it was to be returned on April 25th. The truck had not been returned. It was reported stolen to Gwinnett County police on May the 2nd." Carroll testified that he had seen the Ryder "truck . . . started from the keys that were taken" from Floyd's pocket. During cross-examination Carroll testified that the rental contract for the truck had been "inside the truck."

Floyd did not testify at trial. Although he represented himself at trial, he is represented on appeal. Floyd's sole enumeration of error on appeal is that the evidence of his guilt of burglary and theft by receiving stolen property was insufficient under the test of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

1. With respect to his burglary conviction, Floyd contends that the garden center is not a "building" within the meaning of the burglary statute, OCGA § 16-7-1, and therefore that the evidence is insufficient to meet the requirements of *Jackson v. Virginia* because the State has failed to prove an element of the crime charged. Section 16-7-1 provides that a "person commits the offense of burglary when, without authority and with the intent to commit a felony or theft therein, he enters or remains within the dwelling house of another or any building, vehicle, railroad car, watercraft, or other such structure designed for use as the dwelling of another *or enters or remains within any other building*, railroad car, aircraft, *or any room or any part thereof*." (Emphasis supplied.)

It appears from the trial transcript and photographs that were introduced into evidence that the garden center was contiguous to the main, walled, building of the Wal-Mart; that it had a roof; that it was enclosed by a twelve-foot-high chain-link fence that did not extend to the roof, and that for extra security concrete blocks were stacked five-high in an unmortared wall along the inside of the fence; that a door

provided access from the main building of the Wal-Mart to the garden center; and that during the hours that the Wal-Mart was open to the public the garden center was used as part of the retail space for the Wal-Mart, but that during the hours that the Wal-Mart was closed the garden center was locked and no member of the public was authorized to enter it.

Floyd contends that the "question to be addressed is whether an area that is merely fenced in and covered by a light metal roof constitutes a building or part of a building for the purpose of prosecution under § 16-7-1." He asserts that the garden center was merely a fenced-in area, not a building, and that entry of the garden center could not form the basis of a conviction for burglary. The state responds that "a secured, fenced-in area that also has a ceiling, attached to a retail establishment is a part of the building."

The word "building" was not found in the burglary statute as it existed before the 1968 Criminal Code. Before that enactment, the Code of 1933, § 26-2401, defined "burglary" as "the breaking and entering into the dwelling, mansion, or storehouse, or other place of business of another, where valuable goods, wares, produce, or any other article of value are contained or stored, with intent to commit a felony or larceny. All outhouses contiguous to or within the curtilage or protection of the mansion or dwelling house shall be considered as parts of the same."

The present burglary statute, § 16-7-1, does not define the term "any other building . . . or any room or any part thereof" for purposes of application of that statute, nor is the term defined elsewhere in Title 16. See also OCGA §§ 16-7-60 (a) (2-5) (arson in the first degree); 16-7-61 (a) (arson in the second degree); and 16-11-106 (b) (2, 3) (possession of firearm or knife during commission of or attempt to commit certain crimes), all of which refer to "any building" or "a building" but provide no definition of those terms.

However, the question of the meaning of the term "any other building . . . or any room or any part thereof" has received judicial construction in the case of *Dixon v. State*, 165 Ga. App. 133, 135 (2) (299 SE2d 608) (1983). In *Dixon* the structure in question was "a small enclosure (room) located in the front of [a] grocery store. The enclosure was surrounded by four walls (but without ceiling) and sat on a platform so that the enclosure was elevated above the general floor level of the store. A door to this 'front office' automatically latched when the door was closed. One could reach over the top of the door and unlatch the door from the outside to gain entrance." *Dixon* at 133. The room contained a cabinet in which cash for the operation of that store and other stores was kept. The defendant in that case contended on appeal that "there were fatal variances in the allegata and the probata[,]" arguing that the " 'front office' was not an area or

space subject to being burglarized." Id. at 135 (2). This Court held that "[w]e reject this contention out of hand. Burglary is committed when one, without authority, enters *any building or room or part thereof*. [Cits.] The evidence in this case shows that the room, though small, *was a room for the exclusive use of limited authorized persons and was wholly enclosed and secured as a room*. This portion of the enumeration is without merit." (Emphasis supplied.) Id.

The State contends that, like the room in *Dixon*, the garden center in the present case was part of the main building, and we agree. Like the *Dixon* room, the enclosure in question "was [during the hours the store was closed] a room for the exclusive use of limited authorized persons[,]" as well as "wholly enclosed and secured as a room." *Dixon*, supra, 165 Ga. App. at 135. During the hours the Wal-Mart was open to the public it served as retail space, and functionally was part of the store's retail operations. It was contiguous to the main building, and could be reached from that building through a door that opened into the center. After the store was closed for the day, the garden center was secured and no member of the public was authorized to be there.

The chief distinction between the *Dixon* room and the garden center is that the *Dixon* room was walled, whereas the garden center was only fenced and partly walled with unmortared blocks. However, we find no significance in this distinction, as under all the circumstances the use of a fence rather than a wall to enclose the center made it no less a part of the main Wal-Mart building.

We find support for this conclusion in *Williams v. State*, 105 Ga. 814 (32 SE 129) (1898), which was a case decided under § 179 of the 1895 Penal Code (Section 179 subsequently became 1933 Georgia Code § 26-2630, but was not carried forward into the 1968 Criminal Code). In *Williams* the defendant was charged with taking pigeons from a chicken house which "was about eight feet high, stationary, inclosed with wire and covered with shingles." Id. at 815. Section 179 prohibited stealing money or anything else under the value of $50 from "any dwelling-house, store, shop, warehouse, or *any other building*. . . .'" Section 179 of the 1895 Penal Code, quoted in *Williams*, 105 Ga. at 815. The Georgia Supreme Court held that the structure in question fell within the purview of § 179, since the "language of this section is very broad; and a punishment is not only prescribed for a larceny from the dwelling-house, store, shop or warehouse, but from *any other building*. A building is defined to be 'an edifice for any use; that which is built, as a dwelling-house, barn, etc.' [Cit.] . . . The fact that [the chicken house] was [e]nclosed with wire instead of other material, in our judgment, makes no difference; and it comes plainly under the definition of a house, as used in our statute." *Williams*, 105 Ga. at 815.

We similarly find that the fact that the garden center was enclosed with chain link fence and partly enclosed with an unmortared block wall, instead of other material, makes no difference, and the garden center is a room or part of a building within the meaning of § 16-7-1.

We have noted Floyd's argument that an opinion by this court in an unrelated case, *Floyd v. State*, 186 Ga. App. 777 (2) (368 SE2d 541) (1988), indicates that a fenced structure is not a "building" within the meaning of the burglary statute, but we find that *Floyd* is factually distinguishable. The defendant in that case had been convicted of the burglary of a country club and the "theft by taking of a golf cart from the cart barn, which was used to transport the items stolen from the kitchen and pro shop *in the main building* on the same date. . . . *The golf cart was removed from a fenced area on the [club grounds which was not contiguous to the clubhouse, and] not from the inside of the burglarized clubhouse*." (Emphasis supplied.) Id. at 778. The defendant contended that theft by taking of the golf cart was a lesser included offense of the burglary of the clubhouse, and therefore that he should not have been convicted of the lesser offense. This court disagreed, holding that the theft by taking "was a separate offense and not included in the burglary offense." Id.

In the present case, appellant contends that the "only reasonable ex[p]lanation for this finding is that this Court believed that a fenced-in area is not a 'building' for purposes of applying the burglary statute." However, this argument has no merit, as there is no indication in the *Floyd* opinion that this court considered the question of the nature of the enclosure surrounding the golf cart as part of its determination that the theft by taking was not a lesser included offense.

2. Floyd's remaining contention pertains to his conviction under the theft by receiving stolen property statute, OCGA § 16-8-7, which provides that a "person commits the offense of theft by receiving stolen property when he receives, disposes of, or retains stolen property which he knows or should know was stolen unless the property is received, disposed of, or retained with intent to restore it to the owner. 'Receiving' means acquiring possession or control. . . ." Floyd was indicted for "retaining" the Ryder truck.

Floyd argues that the evidence was insufficient to support his conviction, in that "there was no testimony given and no evidence taken as to how and when the appellant came to have possession, if he did have possession, of the truck, or of whether he knew or should have known that the truck was stolen." Floyd "grant[s] that the keys to the truck were found in his trousers," but he asserts that that fact "is not dispositive of a charge of theft by receiving stolen property because it does not address the appellant's scienter."

(a) As to Floyd's contention that "there was no testimony given and no evidence taken as to how and when the appellant came to have possession, if he did have possession," it was not necessary for the State to show *how and when* Floyd came to have possession, so long as there was sufficient evidence that he *retained* the truck with guilty knowledge. " '(R)etention of stolen property which a person knows or should know is stolen without intent to restore it to the owner will sustain the conviction even where guilty knowledge at the time of the acquisition of the stolen property is not shown. (Cit.)' [Cit.] ' "After the fact knowledge" . . . will sustain a conviction.' [Cit.]" *Pruiett v. State*, 159 Ga. App. 396, 397-398 (1) (283 SE2d 625) (1981).

The evidence, viewed in the light most favorable to the verdict, was that the truck was observed being driven past officers who had the Wal-Mart under surveillance and then out of sight to the rear of the Wal-Mart. Officer Johnstone did not see who was in the truck, but after approximately three minutes he proceeded to the garden center, where he found the truck, backed-up to the fence of the garden center in furtherance of the burglary of the center. A suspect later identified as Floyd was pursued and apprehended, and the key to the rental truck was found in his pocket.

This evidence was sufficient to authorize a trier of fact to find that Floyd retained the rental truck within the meaning of § 16-8-7.

(b) We further find no merit in Floyd's contention that there was insufficient evidence of his guilty knowledge.

" ' "(G)uilty knowledge may be inferred from circumstances which would excite suspicion in the mind of an ordinary prudent man. (Cits.)" [Cit.]' [Cit.]" *Abner v. State*, 196 Ga. App. 752, 753 (1) (397 SE2d 36) (1990). Here, Detective Carroll testified that a copy of the rental contract "was inside the truck." Since the contract indicated that as of May 17, 1991, the truck was more than three weeks overdue to be returned to the rental dealership, anyone who read it would have had reason to suspect that it was stolen. See *James v. State*, 150 Ga. App. 357, 358 (2) (258 SE2d 40) (1979) (new car stolen from dealership had no license tag or inspection sticker, and still had price sticker and dealership paper when recovered from defendant). There was evidence that Floyd was the driver of the truck since he had possession of the truck key when he was apprehended. It is a reasonable inference that, as the driver, he was in control of the vehicle and had knowledge of its contents, including the rental contract contained therein which indicated it was two weeks overdue for return to the leasing company. It is clear Floyd had not obtained the vehicle from the leasing company as they had reported it stolen.

We hold that the circumstances of this case were sufficient to enable a rational trier of fact to find beyond a reasonable doubt that

Floyd knew or should have known that the truck was stolen. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

*Judgment affirmed. McMurray, P. J., and Cooper, J., concur.*

DECIDED FEBRUARY 5, 1993.

*John H. Tarpley*, for appellant.

*Robert E. Wilson, District Attorney, Nancy B. Allstrom, Barbara B. Conroy, Elizabeth W. Morn, Assistant District Attorneys*, for appellee.