A02A2197. GARRETT v. THE STATE.
(578 SE2d 460)

ELDRIDGE, Judge.

A Bartow County jury found Tracey Lyne Garrett guilty as charged on an eight-count indictment that included, inter alia, a charge of burglary which arose when Garrett and his co-defendant/brother cut the ten-foot-high chain-link fence topped with barbed wire that surrounds Bartow Farm & Lawn, Inc. on Highway 441 in Cartersville and removed a commercial grade lawnmower from a storage shelter attached to the rear of the business. Without challenging the sufficiency of the evidence supporting the actual commission of the acts, Garrett appeals, claiming (1) that the trial court erred in denying his motion for directed verdict on the burglary count because, as a matter of law, the shelter from which Garrett removed the lawnmower was not a "building" within the meaning of the burglary statute; and (2) that he received ineffective assistance of counsel at trial. Upon review of the errors as alleged, we affirm Garrett's conviction.

1. Our burglary statute, OCGA § 16-7-1 (a), states in pertinent part that a person commits the offense of burglary when, without

authority and with the intent to commit a felony or theft therein, he enters any building or part thereof. The definition of "building" is at issue in this enumeration of error. In that regard, "Georgia's [burglary] statute is very broad and does not limit its application to buildings of any particular type or in any particular condition."[1] The statute has been interpreted as applying to buildings of "whatever kind."[2] And this interpretation is consistent with precedent established under our prior burglary statute, which defined "burglary" as

> the breaking and entering into the dwelling, mansion, or storehouse, or other place of business of another, where valuable goods, wares, produce, or any other article of value are contained or stored, with intent to commit a felony or larceny. All outhouses contiguous to or within the curtilage or protection of the mansion or dwelling house shall be considered as parts of the same.[3]

So, when determining whether a particular structure is a "building" for purposes of the statute, we look at, among other things, the purpose of the structure,[4] and the statute is commonly understood to apply to "shelter of animals or storage of goods."[5]

In this case, the structure in question is open on three sides with a metal roof covering the top; its purpose is the sheltering and storing of commercial goods; the back wall of the shelter is contiguous to the main building; there is a door from the main building into the shelter; and it is completely enclosed within the chain-link fence that surrounds the building compound, rendering the shelter and its contents unavailable to the public when the business is secured.

Under these circumstances, we find that the contiguous nature of the storage shelter, as well as its accessibility from the main building renders it "a part" of the main building for purposes of OCGA § 16-7-1. Further, the purpose of the shelter as a storage structure for valuable goods, its relevance to the business, and its inaccessibility to the public when the business is secured render the shelter a "building" under the statute, and the unauthorized removal of an

---

[1] *Smith v. State*, 226 Ga. App. 9, 11 (485 SE2d 572) (1997).

[2] Id.

[3] Code of 1933, § 26-2401; see also *Williams v. State*, 105 Ga. 814, 815 (32 SE 129) (1898) (" 'A building is defined to be an edifice for any use; that which is built.' ").

[4] See, e.g., *Redfern v. State*, 246 Ga. App. 572, 575 (540 SE2d 701) (2000) (purpose of tower was to provide a tall structure from which the television broadcast signal could emanate, not to provide shelter).

[5] Id.; *Smith v. State*, supra at 11-12.

item therefrom with the intent to commit a theft is subject to prosecution for burglary.[6]

2. Garrett contends that he received ineffective assistance of counsel at trial because his attorney failed to file a motion to suppress based upon an illegal *Terry*[7] stop and detention; allowed evidence of a "dog sniff line-up" to be introduced; and failed to move for severance based on the introduction of inconsistent statements of Garrett's co-defendant/brother in violation of *Bruton v. United States*.[8]

> The burden [is] on [Garrett] to establish that he received ineffective assistance of counsel, and he was required to show that counsel performed deficiently and that, but for the deficient performance, there was a reasonable likelihood that the outcome of the trial would have been different.[9]

Further, a trial court's finding that a defendant has been afforded effective assistance of counsel must be upheld unless that finding is clearly erroneous.[10]

(a) Garrett first claims that his trial counsel should have filed a motion to suppress evidence based upon an automobile stop unsupported by reasonable suspicion. In that regard,

> [f]ailure to file a motion to suppress is not per se ineffective assistance of counsel; [Garrett] must make a strong showing that if trial counsel had made a motion to suppress, damaging evidence would have been suppressed.[11]

In addition, "[Garrett] had to overcome the strong presumptions that trial counsel's performance fell within the wide range of reasonable professional conduct and that the decision not to pursue the motion was made in the exercise of reasonable professional judgment."[12] In this case, the trial court determined that Garrett "certainly did not prove that a motion to suppress would have been successful." The question, then, is whether the trial court's finding that Garrett failed to make the requisite "strong showing" is clearly erroneous.

In that regard, on appeal from a motion to suppress, this Court

---

[6] *Smith v. State*, supra at 11-12; *Floyd v. State*, 207 Ga. App. 275, 280 (1) (427 SE2d 605) (1993).

[7] See *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968). .

[8] 391 U. S. 123 (88 SC 1620, 20 LE2d 476) (1968).

[9] (Citations omitted.) *Pittman v. State*, 274 Ga. 260, 264 (5) (553 SE2d 616) (2001).

[10] *Jordan v. State*, 247 Ga. App. 551, 554 (2) (544 SE2d 731) (2001).

[11] (Footnote omitted.) *Gadson v. State*, 252 Ga. App. 347, 352 (11) (a) (556 SE2d 449) (2001).

[12] (Citation omitted.) *Pittman v. State*, supra at 264.

views the evidence in a light most favorable to support the trial court's judgment.[13] Viewed in such light, the record shows that the burglary occurred at approximately midnight at Bartow Farm & Lawn in Cartersville. Among others, Sergeant R. Meeks with the Bartow County Sheriff's Department responded to the burglary scene and investigated such. An abandoned pickup truck had been left beside a cut chain-link fence where entry had been effectuated. The truck's loading gate had been lowered, and, in preparation for loading onto the truck, a commercial lawnmower had been moved out of a storage shelter attached to the business. Apparently, however, the loading was suddenly interrupted when the silent alarm was tripped and the business' emergency lights began flashing.

After leaving the burglary scene, Sergeant Meeks patrolled the area. Two hours later, at 2:00 in the morning, Meeks parked his marked patrol car in the parking lot of the Wal-Mart in Cartersville. Bartow Farm & Lawn, where the burglary occurred, is approximately a mile from the Wal-Mart, and both businesses can be accessed through the same open hay field surrounded by tall grass. On the night in question, it had been raining and the area was wet. While parked, the sergeant observed two men walking across the darkened parking lot toward a Honda Accord parked in the very last row of parking spaces up against an embankment, the farthest distance from the entrance to the Wal-Mart. The Accord had been backed into the space and its tag was not visible. Meeks observed that one man's pants were clearly wet from the knees down, although his partner's pants were not. Meeks' patrol car was clearly visible to the men.

The men reached the Accord, got into it, and started the engine; however, they did not drive away, nor did they turn on the headlights. They sat in the parking lot with the engine running. Sergeant Meeks continued to observe, and the Accord did not move. Becoming "impatient," Meeks approached the Accord to speak to the men. "I pulled beside them and I asked them why . . . they had parked so far away from the entrance and they said that they had been riding around and someone had dropped them off." Meeks then asked Garrett why his pants were wet. The officer testified that,

> He said he worked construction and had been in a hole working. And I asked when and where? And he said, around 9:00 p.m., Fort Payne, Alabama. This is 2:00 in the morning.

Thereafter, Meeks determined that his vehicle's position parked immediately beside the Accord was not safe, "So I just said have a

---

[13] *Sanders v. State*, 247 Ga. App. 170 (543 SE2d 452) (2000).

good day, and I backed up." As the Accord drove off, Meeks followed; he saw that the license tag "was just attached by only one screw, and it was kind of hanging, you know. It wasn't straight."

Sergeant Meeks initiated a *Terry* stop: "I stopped them on up the road just before you get to the Waffle House on 20 in a better area, and that placed me behind the vehicle, and then I felt more safe." Meeks testified that he stopped the men based upon the tag and because he "thought there's a good possibility that these two may have been involved in that theft and that burglary, yes, sir." During this stop, Meeks called for backup to investigate the suspects' connection to the burglary. Further investigation led to the Garretts' arrest therefor.

From Supreme Court holdings, three tiers of police-citizen encounters have developed: (1) communication between police and citizens involving no coercion or detention and therefore without the compass of the Fourth Amendment, (2) brief seizures that must be supported by reasonable suspicion, and (3) full-scale arrests that must be supported by probable cause.[14] Sergeant Meeks' initial encounter with the Garretts in the Wal-Mart parking lot fell under the first tier, wherein a police officer may approach an individual and ask a few questions without triggering Fourth Amendment scrutiny.

So, when framed in the context of an ineffective assistance of counsel claim where the burden of proof is on appellant Garrett, the issue is whether Garrett made the requisite "strong showing" that, based on Sergeant Meeks' observations and his lawful initial encounter, a reasonable suspicion for the stop to investigate the burglary did *not* exist. Because no motion to suppress was filed in this case, no record was fully developed as to the existence of and the basis for Meeks' reasonable suspicion to perform the stop. In addition, the record is unclear as to whether certain conversations between Meeks and Garrett occurred during the initial encounter in the parking lot or during the subsequent *Terry* stop: the State argues one way; Garrett insists on a different interpretation; and the facts of record can support both. In the posture of an ineffective assistance of counsel claim, however, it was Garrett's burden to develop the record on motion for new trial in order to clarify discrepancies or inconsistencies;[15] this Court views the facts to support the trial court's ruling. In an ineffective assistance of counsel claim, Garrett has the burden to show that facts and the possible inferences drawn therefrom could

---

[14] *Lewis v. State*, 233 Ga. App. 560 (1) (504 SE2d 732) (1998).

[15] Sergeant Meeks was not called to testify on motion for new trial; his only testimony as to the performance of the *Terry* stop came during trial where no issue was raised with regard to the validity of the stop.

*not* support a reasonable suspicion to stop and, thus, a motion to suppress, if filed, would have been granted.

Further, and notably, in our review of the record before us, we are not bound solely by subjective determinations as to "reasonable suspicion," but may base a determination upon all the facts of record.

> The officer's subjective belief [as to whether he had] authority to detain . . . for continued investigation does not control where the facts objectively show the officer had such authority. Because we decide whether reasonable suspicion justifies a detention based on all the objective facts, we are not limited by the detaining officer's subjective opinions.[16]

With these principles in mind, facts exist in this case which might justify a *Terry* stop in order to further investigate whether the Garretts were connected to the burglary of Bartow Farm & Lawn. Garrett and his brother, strangers to Sergeant Meeks, had no persuasive explanation for being in the Wal-Mart parking lot at 2:00 in the morning. The Wal-Mart parking lot was in close proximity to the burglary scene and separated therefrom by a wet field with tall grass, raising a legitimate inference that one man's pants were wet to the knees from having accessed the Wal-Mart parking lot through the field from the burglary site.

Additionally, the Garretts parked their car at the very end of the large, darkened parking lot — far from any building and people — and had backed into their parking spot, creating the inference that they wished to obscure their license plate and facilitate a rapid, unseen departure. After seeing the patrol car, the Garretts got into their own car and started the engine, but they continued to sit in the parking lot with the engine running and the headlights off, from which an inference arises that the Garretts chose to remain in the parking lot with the hope of avoiding detection, rather than turn on the headlights, leave the lot, and expose their tag and traveling direction to the officer.

Further, upon inquiry, the Garretts' explanation that they had been riding around and had just been dropped off was contradicted by the fact that they were *walking* across a large parking lot, leaving open a question as to why — if they had indeed been "dropped off" at 2:00 a.m. — it had been all the way across a large parking lot instead of at their car. Also, the Garretts' explanation that they had been riding around *together* and dropped off *together* was contradicted by the fact that one man's pants were wet to the knees and the other man's

---

[16] (Citations and punctuation omitted.) *Cole v. State*, 254 Ga. App. 424, 426 (562 SE2d 720) (2002).

pants were not. In fact, the presence of the wet pants, alone, contradicted the notion that the Garretts had simply been "riding around," as they claimed. These multiple contradictions raise a legitimate inference that the Garretts lied to Sergeant Meeks about their reason for being in the Wal-Mart parking lot.

Moreover, Garrett's explanation that he had been working in construction in Alabama that same night provided a link between the Garretts and the abandoned truck with Alabama tags that Sergeant Meeks knew had been found at the burglary scene. The fact that an abandoned, Alabama truck was found at the burglary scene also provides an explanation for the Garretts being on foot at 2:00 a.m. in such close proximity to the burglary scene.

> [C]ourts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior. . . . All of this conduct was by itself lawful, but it also suggested that the individuals were [engaged in criminal activity]. *Terry* recognized that the officers could detain the individuals to resolve the ambiguity.[17]

With regard to his burden to show that nothing in the record could demonstrate a reasonable suspicion to stop, Garrett argues by brief only that,

> The universe of Sergeant Meeks' "articulable suspicion" to justify this stop and detention is as follows: On a rainy night, Sergeant Meeks observed two men in a Wal-Mart parking lot, one of whom wore blue jeans that were wet from the knee down. That is all.

However, as related, facts *and inferences* derived therefrom do exist that might support a reasonable suspicion to stop the Garretts' car in order to investigate the burglary. And these facts and inferences are ignored by Garrett. Accordingly, "[Garrett] has not made the requisite 'strong showing' that [evidence] would have been suppressed had trial counsel made a timely motion."[18] And we cannot say the trial

---

[17] (Citations omitted.) *Illinois v. Wardlow*, 528 U. S. 119 (120 SC 673, 676-677, 145 LE2d 570) (2000); accord *State v. Causey*, 246 Ga. App. 829, 833-834 (540 SE2d 696) (2000); *State v. Ledford*, 247 Ga. App. 412, 416 (543 SE2d 107) (2000).

[18] *Lane v. State*, 250 Ga. App. 160, 163 (1) (549 SE2d 468) (2001).

court clearly erred by rejecting Garrett's ineffective assistance of counsel claim based on the failure to file a motion to suppress.[19]

Because facts and inferences exist which could justify a *Terry* stop in order to investigate a connection to the burglary, Garrett's additional contention under this same enumeration of error that the officer exceeded the scope of a traffic violation stop pursuant to this Court's decision in *State v. Gibbons*[20] is meritless.

Under this same claim of error, Garrett appears to argue that his trial attorney should have filed a motion to suppress based upon an illegal arrest. However, this issue was not raised at the motion for new trial wherein only the stop, the scope of the detention, and statements given in alleged violation of *Miranda*[21] were claimed as a basis for suppression. "Because this allegation of ineffectiveness raised by [Garrett] on appeal differs from those raised before the trial court, this ground is deemed waived."[22]

(b) Garrett claims he received ineffective assistance of counsel on two additional grounds: that his trial attorney (i) failed to object to a "dog sniff line-up" and (ii) failed to make a motion for severance based on a *Bruton* violation with regard to the introduction of his co-defendant/brother's statements. However, these claims "are grounded in matters of trial tactics and strategy and do not provide a basis for finding counsel lacking."[23]

(i) At the motion for new trial, Garrett's trial attorney testified that Garrett wanted to introduce the "dog sniff" evidence because Garrett had told him the dog in question did not alert on anybody and, thus, such evidence would have been exculpatory.

> Well, actually, there was no — there was nothing in the file, in the State's file, about the dog. That information came to me from Tracey [(appellant)]. He indicated that they even brought a dog out there and the dog didn't alert to him. I met with Tracey several times and it was a very circumstantial case, and he insisted on his innocence in this thing and so the dog evidence was evidence in his favor, that the dog, the State's own dog, didn't incriminate him. . . . [A]ll I knew about the dog was what my client had told me, and he wanted the dog evidence in because it tended to exculpate

---

[19] Id.

[20] 248 Ga. App. 859 (547 SE2d 679) (2001).

[21] *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966). A claim of error based upon *Miranda* is not raised on appeal.

[22] *Beecher v. State*, 240 Ga. App. 457, 459 (3) (523 SE2d 54) (1999).

[23] *Harper v. State*, 232 Ga. App. 224, 227 (2) (d) (501 SE2d 591) (1998).

him. . . . We don't have a police report, we don't have a dog handler's report, but Tracey wanted that evidence in.[24]

This strategic decision made after consultation with Garrett does not demonstrate ineffective assistance of trial counsel.[25]

Further, it matters not that, at trial, the dog handler testified that the dog *did* alert on either Garrett or his co-defendant/brother (he could not remember which). This fact does not render counsel ineffective for failing to object to the introduction of the dog handler's testimony when such failure is based upon contrary information relayed to him by Garrett and when Garrett, himself, told his attorney that he wanted the testimony in evidence. "[E]ffectiveness is not judged by hindsight or result."[26]

(ii) Garrett's trial attorney testified at the motion for new trial that Garrett was not going to take the stand at trial because he could not offer a cogent explanation for his presence at 2:00 a.m. in the Wal-Mart parking lot near the burglary site and thus did not want to face cross-examination by the State. However, on the scene, Garrett and his co-defendant/brother had offered exculpatory explanations. It was decided between Garrett's trial attorney and his brother's attorney that the statements made on the scene, while somewhat inconsistent, provided the only mechanism for introducing at least some explanation for the Garretts' presence without subjecting either defendant to cross-examination. Accordingly, no objection — let alone a motion for severance on *Bruton*[27] grounds — was made: "You know, we didn't have a problem with that testimony."

We cannot say that the trial court clearly erred by finding that Garrett's trial counsel's tactical decision demonstrated reasonable professional judgment under the circumstances. "Although another lawyer may have conducted the defense in a different manner and taken another course of action, the fact that defendant and his present counsel disagree with the decisions made by trial counsel does not require a finding that defendant's original representation was inadequate."[28]

Further, no showing has been made that a severance motion based on an alleged *Bruton* violation would have been successful.

[24] See *Spivey v. State*, 193 Ga. App. 127, 130 (3) (386 SE2d 868) (1989).

[25] *Canada v. State*, 275 Ga. 131, 133 (562 SE2d 508) (2002).

[26] (Citation and punctuation omitted.) *Slade v. State*, 270 Ga. 305, 307 (2) (509 SE2d 618) (1998).

[27] *Bruton v. United States*, supra (Sixth Amendment right of confrontation is violated when co-defendants are tried jointly, and a nontestifying co-defendant's statement is used to implicate the other co-defendant in the crime).

[28] (Citation and punctuation omitted.) *Aleman v. State*, 227 Ga. App. 607, 612 (3) (b) (489 SE2d 867) (1997).

While inconsistent when compared to each other, both co-defendants' statements were on their face exculpatory, not inculpatory. "Because [the co-defendant/brother's] statements by themselves do not clearly inculpate [Garrett] in these counts, no *Bruton* error exists."[29] And, thus, no error has been shown by failing to file a motion to sever based on *Bruton*.

Finally, Garrett argues prejudice by directing this Court's attention to the fact that the prosecution "made much hay over inconsistencies between the statements made by Appellant and Paul [(co-defendant/brother)]." But a results-oriented argument plays no role in establishing ineffective assistance of counsel, "[b]ecause counsel's performance is considered in light of the circumstances surrounding the representation, [and] reference to hindsight is inappropriate in judging counsel's performance."[30]

*Judgment affirmed. Smith, P. J., and Ellington, J., concur.*

ON MOTION FOR RECONSIDERATION.

1. On motion for reconsideration, Garrett claims his attorney's failure to file a suppression motion based upon an illegal "arrest" was not waived as a ground for ineffective assistance of counsel because, on motion for new trial, Garrett claimed his attorney should have filed a motion to suppress challenging his illegal "detention." In support of this claim, Garrett directs our attention to the written motion for new trial and his use of the terms "stop and *detention*" therein.

The term, "stop," is not truly synonymous with the term, "detention."[31] But, for purposes of the Fourth Amendment, the two are often used interchangeably. This is because, for all practical purposes, "stops" result in "detentions," no matter how brief they may be. And thus, an initial detention must be supported by the reasonable, articulable suspicion to perform the stop that detains a person.

However, not at all synonymous — especially for Fourth Amendment purposes — are the terms "detention" and "arrest."[32] Clearly, a challenge to the legality of a *detention* based upon lack of reasonable, articulable suspicion to perform the stop is not the same as a claim that the resulting detention ripened into an illegal *arrest*. Garrett

---

[29] (Footnote omitted.) *Wilkins v. State*, 266 Ga. 278, 279 (2) (a) (466 SE2d 592) (1996).

[30] (Citation omitted.) *Head v. Ferrell*, 274 Ga. 399, 404 (554 SE2d 155) (2001).

[31] One (to stop) is the act and the other (detention) is the result of the act. See American Heritage Dictionary (3rd ed.).

[32] See, e.g., *Garmon v. State*, 271 Ga. 673, 678 (3) (524 SE2d 211) (1999) ("[T]he actual circumstances of the stop and subsequent search do not allow the conclusion of illegal arrest. . . . [T]he investigatory detention [may become] an arrest because of its duration."); *Pless v. State*, 218 Ga. App. 603, 605 (2) (462 SE2d 472) (1995) (detention justified by *Terry's* requirement of reasonable, articulable suspicion does not rise to level of an arrest).

cannot use the term illegal "detention" and, simply by virtue of that term's use, alone, try to claim that a challenge to an illegal "arrest" was made — without ever stating an illegal arrest occurred; without ever stating that a detention became an illegal arrest; and without ever stating *how* a detention ripened into an illegal arrest. In this case, no ruling was had in the court below, either at trial or on motion for new trial via an ineffective assistance of counsel claim, that Garrett's detention became an illegal "arrest."[33]

Garrett's citations to the written motion for new trial, by which he attempts to show that a claim of illegal "arrest" was actually made, demonstrate only a challenge to the "detention" based upon a lack of reasonable, articulable suspicion to "stop" Garrett's vehicle. At no time in the written motion for new trial did Garrett claim that the detention became an "arrest," and all the cases cited in the written motion for new trial were cited for the proposition that an illegal detention occurred due to lack of reasonable, articulable suspicion to stop.[34]

In addition, in the motion for reconsideration, Garrett fails to direct our attention to the transcript of hearing on the motion for new trial wherein a claim of illegal "arrest" was never raised. At the hearing on the motion for new trial, Garrett specifically argued to the trial court that a motion to suppress should have been filed because "all the evidence in this case flowed from the *initial* warrantless, and perhaps even suspicionless detention and violation of the defendant's Fourth Amendment rights." Then, in questioning his trial attorney, Garrett, again, did not raise the issue of the detention ripening into an "arrest," but questioned trial counsel's effectiveness because he failed to file a motion to suppress on the basis of "an *initial* illegal detention."

The remainder of Garrett's arguments on motion for reconsideration are based solely on arguments contained in his brief to this Court which, of course, does not show preservation of this issue in the court below. Thus, we conclude that the issue of an illegal "arrest"

---

[33] See *Felix v. State*, 271 Ga. 534, 539 (523 SE2d 1) (1999) (issues which have not been ruled on by the trial court may not be raised on appeal).

[34] *Jefferson v. State*, 217 Ga. App. 747, 752 (459 SE2d 173) (1995) ("trial counsel should have pursued a motion to suppress based on the illegal stop"); *State v. Aguirre*, 229 Ga. App. 736, 739 (494 SE2d 576) (1997) ("defendant's consent to the search of the vehicle was a direct consequence of a pretextual stop"); *Nelson v. State*, 247 Ga. App. 455 (544 SE2d 189) (2001) ("Nelson argues that the stop was illegal. But the stop of a vehicle is authorized, and not pretextual, if the officer observed a traffic offense.") (punctuation and footnote omitted); *Brackins v. State*, 249 Ga. App. 788, 789 (549 SE2d 775) (2001) (cited for proposition that temporary dealer tag insufficient to support stop); *State v. Newton*, 227 Ga. App. 394, 395 (489 SE2d 147) (1997) ("Deputy Williams had no articulable suspicion that defendant or the driver of the vehicle had committed any crime" so as to support the stop).

is waived, both substantively and as a basis for a claim of ineffective assistance of counsel.

2. For these same reasons, we reject Garrett's contention that his claim of ineffective assistance of counsel for failure to file a motion to suppress based upon an illegal initial detention also encompasses a claim that the admission of his statements should have been challenged for failure to receive *Miranda* warnings. A review of the record of Garrett's motion for new trial, as well as his appellate arguments, does not show that such issue was raised and ruled on in the court below and then fairly raised in this Court — *in the context Garrett now claims.*[35]

3. We also find as unpersuasive Garrett's reiteration of his version of the facts surrounding the *Terry* investigative stop in this case. Again, Garrett ignores the *inferences* that may arise from the facts surrounding the stop. On appellate review, this Court views the facts and inferences raised thereby to support the trial court's judgment. And, in the context of an ineffective assistance of counsel claim, Garrett has the burden to rebut such inferences, showing that they were not reasonably raised by the facts in evidence.

For example, it serves no purpose for Garrett to assert on motion for reconsideration that the Wal-Mart parking lot was "fully lighted," not darkened. Sergeant Meeks testified that at 2:00 in the morning the parking lot was "dark lighted. It's nighttime, but it's — they've got the lampposts and the lights out, and you can see pretty good." Viewing this evidence to support the trial court's judgment, as we must, a reasonable inference is raised that the Wal-Mart lot was not "fully lighted," as Garrett would have it.

Likewise, Garrett's insistence that his Alabama connection came to light only after the *Terry* side-of-the-road stop is of little use when Sergeant Meeks testified about such information in the context of the first encounter in the Wal-Mart parking lot. From the record, a reasonable inference arises that any mix-up as to what occurred during the first encounter and the *Terry* stop had to do with when Sergeant Meeks reached down and touched Garrett's wet pants, not when the officer learned of Garrett's Alabama connection: "after I stopped them that's when I actually exited the car and carried on with the conversation and actually reached down and felt the blue jeans at that time. I did not do that at the first encounter." And, of course, in an ineffective assistance of counsel claim, Garrett has the burden to

---

[35] *Felix v. State*, supra at 539; see also *Stone v. State*, 229 Ga. App. 367, 371 (494 SE2d 48) (1997) ("Merely eliciting testimony in the course of a hearing, without raising any argument concerning that testimony in a motion, brief, or argument before the trial court, is insufficient to place the trial court on notice as to what is being asserted and the grounds for the assertion.").

clarify the record and rebut the reasonable inferences that may arise therein. He cannot meet this burden by ignoring such inferences in favor of the facts as he chooses to view them.

*Motion for reconsideration denied.*

DECIDED DECEMBER 20, 2002 —
RECONSIDERATION DENIED FEBRUARY 26, 2003 —

*Garland, Samuel & Loeb, Donald F. Samuel, William C. Lea,* for appellant.

*T. Joseph Campbell, District Attorney, Mickey R. Thacker, Assistant District Attorney,* for appellee.