A08A0469. DADE v. THE STATE.
A08A0470. DUMAS v. THE STATE.
A08A0471. HARRIS v. THE STATE.

(666 SE2d 1)

SMITH, Presiding Judge.

After a joint trial, a jury convicted Ferlando Dade of possession of marijuana with the intent to distribute, Emarcus Dumas of trafficking in and possession of marijuana, and John Harris of armed robbery, kidnapping, and possession of a firearm during the commission of a crime. In their appeals, Dade and Dumas assert that they are entitled to a new trial because their trial counsel provided ineffective assistance of counsel by failing to properly file a motion to suppress. Harris asserts that he is entitled to a new trial because his counsel was ineffective by failing to object to bad character evidence and testimony about the ultimate issue in the case. For the reasons set forth below, we affirm.

The two-prong test for evaluating the validity of a claim of ineffectiveness of counsel "asks whether counsel's performance was deficient and, if so, whether this deficiency prejudiced the defense; that is, whether there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's defi-

ciency." (Citations, punctuation and footnote omitted.) *Bruce v. State*, 252 Ga. App. 494, 498 (2) (555 SE2d 819) (2001). "A trial court's finding that a defendant has not been denied effective assistance of trial counsel will be affirmed unless clearly erroneous." (Citations and punctuation omitted.) *Scapin v. State*, 204 Ga. App. 725 (420 SE2d 385) (1992).

Viewed in this light, the record shows that a DeKalb County police officer responded to a dispatch call of a "burglary in progress" at 1046 Main Street Lake Drive around 1:00 p.m. When the officer arrived six minutes later, he saw signs of forced entry. The victim could not provide a description of the person trying to enter her home or of any vehicle that may have been involved.

When a helicopter arrived as backup, its pilot informed the officer that he had observed "a van" or a "maroon van" driving down the street away from 1046 Main Street Lake Drive. The record contains the following descriptions of the maroon van's suspicious nature: It moved very slowly; it moved slowly, stopped, and then sped away down a dirt road; and it was "traveling at a high rate of speed in the vicinity of the address of the burglary complaint."

The officer responding to the attempted burglary call decided to attempt to locate the van and investigate. The helicopter followed the maroon van and reported to the officer that it had driven into a garage located at 1025 Main Street Lake Drive, a few houses away from where the attempted burglary occurred. The helicopter also reported that two men exited the van and went into the home and that someone closed the garage door from the inside "in a very quick fashion."

Believing that the van may have been involved in the attempted burglary, the officer went to the door of the residence to investigate. At this time, the officer also knew from another radio report that either "a white van" or "a van" of an unidentified color had been recently involved in an armed robbery within the same police precinct.

When the officer knocked several times on the front door and no one answered, he went around the back of the house to determine if there were any other doors to the house because he "couldn't understand why they weren't coming to the door." After knocking on one set of back doors and still receiving no response, the officer began checking the doors to determine if the house was secure. The record shows that the officer then discovered that one of the doors was either unlocked, open, or ajar. At this point, the officer suspected that another burglary might be in progress because the helicopter confirmed that people had entered the residence and had not left before the officer's arrival.

The officer either opened an unlocked door or swung open a door that was ajar and announced, "DeKalb Police . . . Show yourselves." The officer did not enter the house. Although the officer heard "commotion" inside the house, no one came to the door. Because the officer did not know who was in the house, whether they might be armed, and whether he might be in danger, he drew his weapon and again commanded the occupants to come out.

When Dumas, Dade, and Taron Smith showed themselves to the officer, he ordered them to lie down. The officer asked them to step outside one at a time, where they were checked for weapons and then asked to sit down. Although the men were not under formal arrest or placed in handcuffs, they were not free to leave because the officer was investigating who owned the house and the van to ensure that he had not interrupted a burglary in progress.

The officer started asking the men questions, and Dumas admitted that he owned the van. Taron Smith rented the house from Dade, who owned it. The men did not provide a reasonable explanation as to why they had not answered the door. When the officer asked Dumas if he could "take a look at the van," Dumas "seemed hesitant" and did not immediately consent, but instead described the van. The officer explained to Dumas that there had been another crime involving a van and asked again for consent to look at it. After this second request, Dumas consented. At the time, the officer was not sure what color van had been involved in the armed robbery because there "was a lot of confusion going on at that point." He "was trying . . . to deal with that situation at hand with the occupants at the house, information I was getting from Air 90 and several other officers that kept keying up on the radio at that time."

After obtaining consent, the officer followed Dumas into the house and the entry to the garage. Dumas tried to turn around and walk back outside, which gave the officer the impression that Dumas did not want to be present when the officer looked at the van. The officer told Dumas "hold up a second and . . . stand right there." The officer "wanted to keep him in sight" as a safety precaution because he did not know if anyone else was in the house. Dumas's actions led the officer to believe that Dumas did not want the officer to go in the garage and that "something was going on." The officer did not interpret Dumas's conduct as a withdrawal of consent, and the officer denied that he forced Dumas to do anything. At no time did Dumas tell the officer that he could not look at his van.

When the officer walked into the garage and looked at the maroon van, he saw what appeared to be a bale of marijuana inside it in plain view. The officer then arrested all three men and searched

the house,[1] where they found a fourth man, Harris, shirtless and hiding under some clothes in a closet. After obtaining a search warrant, police searched the van and found over 63 pounds of marijuana, duct tape, two handguns, two black ski masks with Dumas's DNA on them, a white T-shirt with the blood of the armed robbery victim on it, and the armed robbery victim's identification, wallet, and checks.

When a detective searched Harris, he found a check made payable to Chem-Dry in the amount of $400 in his pocket. Harris told the detective that he worked for Chem-Dry and claimed that it was his check. After conducting more interviews and getting conflicting statements, the detective believed "something wasn't right" and went back to Harris about 15 minutes later to retrieve the check. At that time, Harris no longer had the check.

On the same day and less than two hours before Dade, Dumas, Harris, and Smith were arrested, Calvin White was robbed by two men after being called to perform carpet cleaning at a home that was for sale. After determining that he could not perform the carpet cleaning because the power was not turned on, the man he met at the home pulled out a gun and screamed at White "to get down." Another man wearing a ski mask over his face came down the stairs, and the two men wrapped duct tape around White's body from "head to toe." They then hit White on the head twice and dragged him down a series of stairs to the basement, where they left him. The men took his wallet, checks for work he had performed, and his keys before driving away in his white work van. One of the checks was in the amount of $400 and payable to Chem-Dry. Less than ten minutes later, White escaped and reported the robbery to the police.

Two days after the robbery, White identified Harris in a photographic lineup as the person who met him at the house and robbed him. A detective also showed White a second photographic lineup that included Dade, but White could not identify anyone in that lineup as being involved in his armed robbery. Police lifted a fingerprint from the interior side of the front storm door of the house where White was robbed that matched Dumas's fingerprint. A crime scene investigator testified that she could not differentiate between duct tape found in Dumas's maroon van and that which was wrapped around White during the armed robbery.

Dade and Dumas, through separate counsel, filed general motions to suppress all evidence illegally seized by police, but failed to provide a factual basis for their motions before trial. When the case was called for trial, Dumas's trial counsel asked the trial court to rule

---

[1] In exchange for his testimony, the State agreed to dismiss the charges against Smith.

on his pending motion to suppress and Dade's counsel joined in Dumas's motion to suppress. The State objected on the grounds that Dade and Dumas failed to specify the grounds of their motions before trial, and the trial court dismissed the motions to suppress because they were "procedurally defective."

### Case No. A08A0470

"When trial counsel's failure to file a motion to suppress is the basis for a claim of ineffective assistance, the defendant must make a strong showing that the damaging evidence would have been suppressed had counsel made the motion. [Cit.]" *Richardson v. State*, 276 Ga. 548, 553 (3) (580 SE2d 224) (2003). In reviewing such a claim, the reviewing court may look at the information available to counsel when evaluating whether such a motion would have been granted. See *Vasquez-Vargas v. State*, 265 Ga. App. 852, 854 (595 SE2d 668) (2004).

Dumas contends he has fulfilled his burden of making "a strong showing" that the marijuana found in his van would have been suppressed had his trial counsel filed a sufficiently detailed motion to suppress.[2] *Richardson*, supra, 276 Ga. at 553 (3). Dumas asserts that because the police illegally seized and detained his person, the marijuana should have been suppressed as fruit of the poisonous tree.[3] He contends the officer's conduct in ordering him out of a private residence at gunpoint "was flagrant and excessive police misconduct" that rendered his detention illegal. We disagree.

The issue before us is whether the seizure of Dumas's person violated the Fourth Amendment. See *Brown v. State*, 240 Ga. App. 321, 322 (1) (523 SE2d 333) (1999). Because he was in another person's home at the time he was seized and the police never entered the home, we must determine whether our analysis should be based on reasonable suspicion for a *Terry* detention or exigent circumstances authorizing entry of a home without a warrant. See *Hopkins v. State*, 661 S2d 774, 778-779 (Ala. Crim. App. 1994) (noting issue). Some courts characterize police conduct in ordering a person out of a home at gunpoint as "constructive entry." See generally *People v. Gillam*, 479 Mich. 253, 260 (734 NW2d 585) (2007) (discussion of constructive entry doctrine).

---

[2] Dumas does not assert that the trial court erred by dismissing his motion to suppress. See generally *Dean v. State*, 246 Ga. App. 263, 264 (540 SE2d 246) (2000).

[3] Dumas effectively concedes that he has no standing to object to the officer's search of Smith's garage because he had no reasonable expectation of privacy in the garage. See *Brown v. State*, 240 Ga. App. 321, 323 (1) (523 SE2d 333) (1999) (Fourth Amendment rights personal in nature and cannot provide vicarious protection to those without a reasonable expectation of privacy in the place searched).

Courts from other jurisdictions have also applied the exigent circumstances analysis to facts similar to those presented here. See, e.g., *State v. Maland*, 140 Idaho 817, 820-821 (I) (103 P3d 430) (2004) (rejecting *Terry* analysis in favor of exigent circumstances analysis); *LaLonde v. County of Riverside*, 204 F3d 947, 954-955 (9th Cir. 2000) (same); *Mickelson v. State*, 906 P2d 1020, 1022, 1024 (Wyo. 1995) (same); *State v. Davis*, 295 Ore. 227, 241-243 (666 P2d 802) (1983) (same); *United States v. Tobin*, 923 F2d 1506, 1509-1510 (11th Cir. 1991) (same). It appears, therefore, that this case calls for an exigent circumstances analysis. Cf. *Pickens v. State*, 225 Ga. App. 792, 794 (1) (b) (484 SE2d 731) (1997) ("warrantless intrusion of person's home is prohibited . . . absent consent or a showing of exigent circumstances") (citation and punctuation omitted).

> Those cases applying the exigent circumstances exception to the Fourth Amendment's warrant requirement can be divided into two general categories. The first category addresses those exigent circumstances encountered by police in the pursuit of their traditional law enforcement duties — i.e., their duty to enforce criminal and traffic laws and to prevent, detect, and investigate crime. [Cit.]

*Love v. State*, 290 Ga. App. 486, 488 (659 SE2d 835) (2008). One circumstance includes "where an officer reasonably perceives that a suspect within the dwelling poses a risk of danger to the police or others. [Cits.]" Id. "The second category of cases addresses exigent circumstances encountered by police in the pursuit of their duties to preserve public order, to maintain the peace, and to protect lives, persons, property, health, and morals." (Citations and punctuation omitted.) Id. A reasonable belief that a burglary is occurring in a home provides exigent circumstances authorizing a police officer to enter without a warrant. Id. See also *Murdock v. Stout*, 54 F3d 1437, 1441-1442 (9th Cir. 1995); *Hamlet v. State*, 490 NE2d 715, 719 (I) (Ind. 1986) (exigent circumstances supported officer ordering occupants out of residence).

In this case, the officer was dealing with a rapidly developing situation in which he received conflicting radio reports about a van involved in an armed robbery and knew that a maroon van drove away in a suspicious manner from the scene of an attempted burglary into the garage of a home four houses away. The officer also knew that the garage door was closed in very quick fashion by hand from the inside after the van entered the garage, that two men entered the house and had not left, that a back door of the home was either unlocked or ajar, and that no one responded to his requests to show themselves despite obvious commotion within the house. We

find that these facts provided the officer with sufficient exigent circumstances to draw his handgun and order the occupants of the residence to show themselves and come outside. *Love*, supra.[4]

Based on our conclusion that Dumas was *not* illegally seized or detained in violation of the Fourth Amendment, we need not address his argument that the officer's subsequent search of the house should have been excluded as fruit of the poisonous tree. Compare *Tiller v. State*, 261 Ga. App. 363, 365 (582 SE2d 536) (2003). Because Dumas has failed to show a reasonable probability that a motion to suppress would have succeeded, we affirm the trial court's denial of his ineffective assistance of counsel claim. *Garrett v. State*, 259 Ga. App. 870, 876 (578 SE2d 460) (2002).

## Case No. A08A0469

Dade contends that he can make a strong showing that he would have succeeded on a motion to suppress because he has standing to object to the police officer's search of the garage. "The burden is on the defendant to show that he has standing to contest the alleged violation, i.e., that he has a legitimate expectation of privacy." (Citation and punctuation omitted.) *State v. McCarthy*, 288 Ga. App. 426, 428 (2) (654 SE2d 239) (2007). "Whether the accused (1) had the right to possession of the seized item, (2) had the right to exclude others from the area searched, and (3) took normal precautions to maintain the privacy and security of the items seized, are important factors in that analysis." (Citations omitted.) *Robinson v. State*, 226 Ga. App. 406, 408 (2) (486 SE2d 667) (1997).

The record shows that Dade owned the house but had leased it to Smith for three years. Dade kept lawn and fishing equipment in the garage, fished on the property, hosted parties at the house, and occasionally spent the night. He did not have his own room in the house. Smith was not expecting Dade on the date they were arrested, and when Dade arrived, Smith thought he would be asking for the rent. Nothing in the record shows that Dade had an ownership interest or expectation of privacy in the maroon van located in Smith's garage. See generally *Rose v. State*, 263 Ga. App. 263, 264-265 (1) (b) (587 SE2d 326) (2003).

We find this evidence insufficient to show a reasonable probability that Dade would have successfully asserted standing had his counsel filed a motion to suppress. See *Sims v. State*, 251 Ga. 877 (311 SE2d 161) (1984) (noting in dicta that there would be no

---

[4] Our opinion in *State v. Sims*, 240 Ga. App. 391, 393 (523 SE2d 619) (1999), does not alter this result because there was no evidence in that case that the police officer knew for a certainty that someone was inside the home. Instead, the officer was investigating an already completed offense that had occurred at an unrelated location.

expectation of privacy in diary that was casually placed on the floor of a storage area to which others had access); *United States v. Tobin*, 890 F2d 319 (11th Cir. 1989), vacated on other grounds, 902 F2d 821 (11th Cir. 1990) (en banc) (granting rehearing) ("[n]othing in the record persuades us that [he] had any reasonable expectation of privacy in the whole garage rather than only in the items he stored in the garage.)" Id. at 326. Compare *United States v. Fultz*, 146 F3d 1102, 1105 (I) (9th Cir. 1998) (homeless person had legitimate expectation of privacy in sealed cardboard box stored in another's garage). Because Dade lacks standing to contest the officer's search of the garage and has not asserted an ownership interest in the maroon van, we find no merit in his ineffective assistance of counsel claim. Id.

### Case No. A08A0471

Harris asserts his counsel was ineffective for failing to object to testimony: (1) that Harris "looked scraggly" and was not well-groomed when he was arrested; (2) that Harris was incarcerated for 16 months before trial; (3) that the detective asked Harris about the Chem-Dry check again because "something wasn't right"; (4) that Harris was a prime suspect; and (5) that Harris's description matched the suspect described by White.

1. We find no merit in Harris's complaint that his trial counsel should have made a bad character objection to a police officer's testimony that Harris looked scraggly and was not well-groomed on the day he was arrested. In the motion for new trial hearing, Harris's counsel explained that she did not object to this testimony because she did not believe it was evidence of bad character. While she denied refraining from objecting based upon trial strategy, she also testified that evidence about his poor appearance might help rebut the notion that he was the type of person who was dealing 63 pounds of marijuana. She also testified that a picture was admitted into evidence showing that Harris was "looking scraggly and not well-groomed."

We find no merit in this claim of ineffectiveness. "Trial strategy and tactics do not equate with ineffective assistance of counsel." (Citation, punctuation and footnote omitted.) *Caylor v. State*, 255 Ga. App. 362, 364 (1) (566 SE2d 33) (2002). Moreover, any error in failing to object was harmless because the overwhelming evidence supporting the verdict renders it highly unlikely that the testimony about Harris's appearance contributed to the verdict. See *Parker v. State*, 281 Ga. 490, 493-494 (3) (d) (640 SE2d 44) (2007).

2. Harris asserts his counsel should have asserted a bad character objection when the State elicited on cross-examination informa-

tion about how long he was imprisoned before trial. We find no merit in this contention because "it is well settled in Georgia that evidence that a defendant has been incarcerated in connection with the crime for which the defendant is on trial does not place the defendant's character in issue and does not require reversal." (Citations and punctuation omitted.) *Handspike v. State*, 279 Ga. App. 496, 496-497 (631 SE2d 730) (2006).

3. "[W]e need not analyze the deficient performance prong of appellant's remaining claims of ineffectiveness because we hold that appellant cannot show how any of those deficiencies prejudiced his defense" in light of the overwhelming evidence of his guilt. (Citation and footnote omitted.) *Ruffin v. State*, 283 Ga. 87, 91 (12) (f) (656 SE2d 140) (2008). See also *Fulton v. State*, 278 Ga. 58, 63 (8) (597 SE2d 396) (2004) (no prejudice resulted from counsel's failure to object to alleged statement of opinion on ultimate issue by police officer).

*Judgments affirmed. Mikell and Adams, JJ., concur.*

ON MOTION FOR RECONSIDERATION.

In his motion for reconsideration, Dumas asserts that this court should also address whether his consent was coerced by his unlawful continued detention after the police removed him from the house. We note that Dumas did not clearly articulate this argument in his initial brief to this court. He never argued that the officers unlawfully continued his detention, perhaps because he claimed the initial detention was illegal. A close examination of his brief reveals, however, that he did state in passing that he gave consent "during his ongoing illegal detention." As a result, we will now address his continued detention claim.

According to Dumas, the officer "dispelled any suspicion about an ongoing burglary when he learned that the co-defendant was an owner of the house." We find no merit in this contention. Dumas points to no evidence establishing the length of time that passed between his removal from the home and the officer's request for consent to search. Under these circumstances, we cannot find as a matter of law that Dumas's consent to search the van resulted from an unlawful prolonged detention. See *State v. Sawyer*, 291 Ga. App. 462 (665 SE2d 2) (2008) (finding officer investigating possible burglary did not unlawfully expand the scope and duration of his investigation by asking for consent to search).

DECIDED MAY 29, 2008 —
RECONSIDERATION DENIED JULY 24, 2008

*Gerard B. Kleinrock*, for appellant (case nos. A08A0469 and A08A0470).

*Zell & Zell, Rodney S. Zell*, for appellant (case no. A08A0471).

*Gwendolyn Keyes Fleming, District Attorney, Leonora Grant, Assistant District Attorney*, for appellee.